715 A.2d 188

## VF CORPORATION and Blue Bell, Inc.

### v.

## WREXHAM AVIATION CORPORATION.

No. 36, Sept. Term, 1997.

Court of Appeals of Maryland.

July 30, 1998.

Reconsideration Denied Sept. 10, 1998.

Benjamin R. Civiletti (Nell B. Strachan, Mitchell Y. Mirviss, Venable, Baetjer and Howard, L.L.P., Baltimore, all on brief), for Petitioner.

Melvin J. Sykes, Baltimore (Timothy E. Meredith, Warfield Meredith & Darrah, Severna Park, all on brief), for Respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

ELDRIDGE, Judge.

This case, in its present posture, is a deceit action growing out of the sale of an air freight corporation. The buyer alleged, and the jury found, that the seller knowingly misrepresented the financial condition of the air freight corporation. The jury awarded $189,336.61 compensatory damages and $21,400,000.00 punitive damages for the fraud. The dispositive issue before us is whether there was sufficient evidence of fraud for the case to have been submitted to the jury.

## I.

Prior to May 1988, Wrangler Aviation, Inc., an air freight company, was a wholly owned subsidiary of Blue Bell, Inc., and Blue Bell in turn was a wholly owned subsidiary of VF Corporation. In May 1988, Blue Bell sold Wrangler Aviation, Inc. to W.A. Services, Inc. VF helped finance the sale and took a security interest subordinate to a first lien held by Perpetual Savings Bank.

Approximately two years later, in May 1990, Perpetual notified VF that W.A. Services, Inc., was in default and that, unless VF cured the default, the bank was going to foreclose

and cause W.A.'s assets to be sold. Having lent W.A. approximately $6.1 million, of which $5.25 million was still outstanding, VF cured the default and took back, through Blue Bell, 100% of Wrangler Aviation's stock. Up until May 1990, Robert Faia, who had been one of the principals of W.A. Services, Inc., was Chief Executive Officer of Wrangler Aviation. When Blue Bell took back Wrangler in May 1990, Varnell Moore was made Chief Executive Officer of Wrangler, and Faia became Executive Director of Sales of Wrangler. Howard Spradlin, previously an employee of Blue Bell, was installed as Wrangler's Chief Financial Officer. Larry Scheevel, Wrangler's previous Chief Financial Officer, assumed the position of Vice President of Finance. Wrangler was experiencing financial difficulties, and, from May 1990 through October 1990, VF infused approximately $1.76 million into Wrangler to sustain its cash flow. Upon Blue Bell's acquisition of Wrangler in May 1990, VF immediately began efforts to sell the air freight company.

In anticipation of a sale, VF engaged KPMG Peat Marwick to conduct an audit of Wrangler and prepare audited financial statements pursuant thereto for the fiscal year ending June 30, 1990. The Independent Auditor's Report stated, *inter alia*, that Wrangler's "losses from operations in 1990 and working capital deficiency at June 30, 1990 raise substantial doubt about the entity's ability to continue as a going concern...." Specifically, the audited statement reflected, for the fiscal year ending June 30, 1990, annual operating revenues of $42,595,137.00, and annual expenses of $46,301,486.00, for a net loss of $3,706,349.00. Additionally, the "Statements of Cash Flows" showed that, in spite of VF's infusion of cash, Wrangler experienced a cash overdraft of $1,233,465.00 for the same period. Finally, the "Notes to the Financial Statement" reiterated Peat Marwick's apprehension of Wrangler's ability to continue as a going concern.

In October 1990, following extensive negotiations and full disclosure of the above financial information, VF and Blue Bell contracted to sell Wrangler to Wrexham Aviation Corporation. Frank Pickard, who was VF's treasurer, oversaw and con-

trolled on behalf of VF and Blue Bell the contract negotiations and the ultimate settlement. Wrexham was organized for the sole purpose of acquiring Wrangler, and executives of its majority stockholder, Parkway Holdings, a large multi-national holding company and conglomerate based in Singapore, negotiated on behalf of Wrexham. The total sale price, which included both a cash payment and Wrexham's assumption of VF's liabilities to Perpetual Savings Bank, was approximately $9 million.

A Purchase Agreement was executed on Friday, October 19, 1990, that contained, *inter alia,* the following provisions:

"9. (h) Attached hereto as Schedule 9(h) is a copy of the Company's financial statements for the fiscal year ended June 30, 1990, which were audited by KPMG/Peat Marwick. To the best of Seller's knowledge, such financial statements, including any qualifications set forth ... therein, fairly present the Company's financial condition and results of operation for the Company's fiscal year ended June 30, 1990.

\* \* \*

"(m) Subject to the limitations set forth in Section 15(d) hereof, the representations and warranties made by the Seller in this Section 9 or elsewhere in this Agreement shall survive the closing.

\* \* \*

"As used in this Section 9, the term 'knowledge' shall mean the actual knowledge of any of the officers of the Seller and VF. . . .

\* \* \*

"13. (a) There shall not be any material error, misstatement or omission in the representations and warranties made by the Seller in this Agreement; all representations and warranties by the Seller contained in this Agreement

shall be true in all material respects at and as of the Closing as though such representations and warranties were made at and as of said date. . . .

\* \* \*

"15. (a) Upon the terms, and subject to the conditions of this section 15, the Seller shall indemnify, defend and hold the Buyer harmless from, against and with respect to any claim, liability, obligation, loss, damage, deficiency, assessment, encumbrance, judgment, cost, and expense . . . of any kind or character, arising directly as the result of . . . and not including consequential damages (i) any material inaccuracy in any representation . . . by the Seller in connection with this Agreement or otherwise made or given in connection with this Agreement and (ii) any material failure by Seller to perform or observe, or to have performed or observed, any covenant, agreement or condition to be performed or observed by Seller under this Agreement, or under any certificates or other documents or agreement executed by Seller in connection with this agreement.

\* \* \*

"(d) Notwithstanding anything to the contrary in this Agreement:

\* \* \*

"(ii) Seller's total obligation to indemnify, defend or hold Buyer harmless under this Section 15 or otherwise shall not exceed the Purchase Price. . . ."

\* \* \*

"16. *Due Diligence.* The Buyer has, prior to the date hereof and to its full and complete satisfaction, conducted and completed a due diligence examination of [Wrangler's] business, records, properties and assets, and the liabilities, prospects, affairs, financial position, and results of opera-

tions of [Wrangler].... The Buyer acknowledges that the Seller and [Wrangler] provided the Buyer with full and complete access in completing such due diligence examination.... In connection with the Buyer's due diligence examination of the Business of [Wrangler], the Buyer has not relied upon any statement, opinion, representation, or warranty of the Seller, VF, or either of their respective directors, officers, employees, agents, or representatives, express or implied, other than those representations and warranties of the Seller expressly set forth in Section 9 hereof or elsewhere in this Agreement...."

In addition, section 7(a)(v) provided that, at settlement, VF would deliver a Closing Certificate stating that representations and warranties in the contract of sale "are true, accurate and complete in all material respects."

Coincidentally, also on Friday, October 19, 1990, Larry Harden, Comptroller of Wrangler, was notified that an audit of Wrangler's North Carolina sales and use tax filings for the period of May 1, 1988, through June 30, 1990, had been completed by the field auditor. The audit had begun in August 1990. The field auditor requested an appointment to review the audit, and Harden scheduled the appointment for the afternoon of Monday, October 22nd.

Harden met with the auditor on the afternoon of October 22nd and learned that the field audit indicated that Wrangler had improperly applied for and received sales and use tax refunds in the amount of $278,229.22 for the twenty-six month period covered by the audit. Adding penalties and interest, the initial proposed assessment totaled $372,199.45. During the discussion of the proposed assessment several errors in the audit report amounting to approximately $43,000 were immediately identified. Additionally, the field auditor stated that under certain circumstances the penalties and interest may be abated, that the entire assessment may be appealed, and that portions of the assessment could be reversed.

Harden immediately presented the results of the field audit to Scheevel, Wrangler's Vice President of Financial Affairs.

Harden testified that he reported the audit results to no one other than Scheevel. Scheevel then informed Wrangler's Chief Executive Officer, Varnell Moore, of the audit. Thereafter, Frank Pickard was informed by telephone that a field auditor had raised an issue of a potential tax liability. Pickard conferred with Ernest Choquette, VF's legal counsel for the Wrangler sale, concerning whether the audit should be disclosed to Wrexham. Pickard testified, without contradiction, that he was neither aware of the period of time the audit covered nor of the components of the audit nor of its finality. Choquette counseled that a tax audit in such a preliminary stage was too indefinite to require disclosure.

The sale of Wrangler to Wrexham was completed the next day, on October 23, 1990. Pursuant to the Purchase Agreement, the following Closing Certificate was signed by Pickard, thus reaffirming the accuracy of the KPMG Peat Marwick Independent Auditor's report for the fiscal year ending June 30, 1990:

"The Seller hereby certifies that all of the representations and warranties with respect to the Seller contained in the Purchase Agreement are true, accurate and complete in all material respects on and as of the date hereof. The delivery of this Certificate in no way expands, diminishes or supercedes the warranties and representations of the Seller contained in the purchase agreement."

Immediately following the settlement, Wrexham re-installed Robert Faia as Wrangler's President and Chief Executive Officer. Moore resumed his previous position with the defendants, and Scheevel resumed his position as Chief Financial Officer for Wrangler. On November 2, 1990, a memorandum concerning the tax audit report, authored by Scheevel and directed to Faia, stated in pertinent part as follows:

"The State of North Carolina just completed a sales and use tax audit of Wrangler Aviation for the period of 05/01/88 thru 06/30/90. The enclosed documents are the result of their audit. As you can see, the total liability they are

claiming is $372,199.45 which includes balance of tax, penalty and interest.

"[W]e are not sure how much of [the total liability] is valid and how much we can contest. It is generally felt the penalty portion can be mitigated and we know of one error on their part [that] represent[s] almost $100,000 of the total.

\* \* \*

"Our expectation is that the amount will be reduced but by how much is too soon to tell."

Six days later, on November 8, 1990, the State of North Carolina issued a notice to Wrangler stating that "a proposed assessment for sales and use tax" plus interest and penalties for the twenty-six month period ending June 30, 1990, was being made. The proposed assessment totaled $353,984.14 and detailed the amount owed as follows: taxes owed in the amount of $260,013.91; penalties owed in the amount of $65,003.48; interest owed in the amount of $28,966.75.

Wrangler began negotiating with the State of North Carolina, seeking to abate the penalties and specific findings contained in the proposed assessment. Ultimately, the final amount assessed and paid by Wrexham totaled $189,336.61, approximately one-half of the field auditor's original proposed assessment. The principal amount of sales and use taxes which were improperly refunded for the single fiscal year covered by the KPMG Peat Marwick Auditor's Report of June 30, 1990, was $107,000.00.

In March 1991 Wrexham contacted VF and requested that it remit $353,984.14 in connection with the assessment. VF refused, and on October 21, 1993, Wrexham filed the present action against VF and Blue Bell in the Circuit Court for Baltimore City. In a two count complaint, Wrexham alleged that VF and Blue Bell fraudulently misrepresented Wrangler's financial status because of the tax liability and that they breached the warranty contained in paragraph 9(h) of the purchase agreement. The plaintiff sought both compensatory and punitive damages.

Following a six day trial, the jury found that VF was liable for compensatory and punitive damages. Specifically, the jury found that VF and Blue Bell had breached the warranty in the contract of sale, and the jury awarded Wrexham $535,000.00 under the breach of contract count. In addition, the jury found liability under the tort count charging fraud or deceit, and it awarded $189,336.61 compensatory damages plus pre-judgment interest under that count. The jury also determined that VF and Blue Bell were liable for punitive damages and, following a separate penalty phase of the trial, awarded Wrexham $21.4 million in punitive damages. VF filed motions for judgment notwithstanding the verdict, a new trial, and remittitur, which were denied. VF and Blue Bell then appealed to the Court of Special Appeals.

The Court of Special Appeals affirmed the judgments for compensatory damages but vacated the judgment for punitive damages. The intermediate appellate court remanded the case for the circuit court to conduct a post-verdict review of the punitive damages award under the standards of *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1(1991). *See V.F. Corp. v. Wrexham Aviation,* 112 Md.App. 703, 686 A.2d 647 (1996).[1]

VF and Blue Bell filed a petition for a writ of certiorari which we granted. *V.F. Corp. v. Wrexham Aviation,* 346 Md. 28, 694 A.2d 951 (1997). The petitioners do not in this Court challenge the award of compensatory damages under the breach of contract count. They do, however, challenge the award of compensatory damages under the tort count charging fraud, arguing that, in light of the elements of a deceit action, there was insufficient evidence for submission of the tort count to the jury. Additionally, VF and Blue Bell attack

---

**1.** After the Court of Special Appeals' opinion in this case, this Court filed an opinion in *Bowden v. Caldor,* 350 Md. 4, 710 A.2d 267 (1998), setting forth the principles of Maryland law applicable to post-verdict judicial review of punitive damages awards.

the punitive damages award on various grounds. The respondent Wrexham did not file a cross-petition for a writ of certiorari challenging the Court of Special Appeals' judgment vacating the punitive damages award and remanding for post-verdict review.

■ Because we agree with the petitioners that there was insufficient evidence of fraud for the tort count to have been submitted to the jury, we need not reach the issues raised concerning punitive damages.[2]

## II.

### A.

■ This Court has set forth the elements of the tort action of fraud or deceit in numerous opinions. In *Nails v. S & R*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994), we summarized as follows:

"In order to recover damages in an action for fraud or deceit, a plaintiff must prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation."

*See, e.g., Alleco v. Weinberg Foundation,* 340 Md. 176, 195–196, 665 A.2d 1038, 1047–1048 (1995); *Ellerin v. Fairfax Savings,* 337 Md. 216, 229–230, 652 A.2d 1117, 1123–1124

---

**2.** Since, under Maryland law, punitive damages are allowable only in a tort action and only when there is an award of compensatory damages based on that tort, our reversal of the judgment for compensatory damages under the tort count in this case will automatically require a reversal of the punitive damages award. *See, e.g., Bowden v. Caldor, supra,* 350 Md. at 22–23, 710 A.2d at 276–277, and cases there cited; *Medical Mutual v. Evander,* 339 Md. 41, 57, 660 A.2d 433, 441 (1995); *Alexander v. Evander,* 336 Md. 635, 650, 650 A.2d 260, 267 (1994).

(1995); *Gross v. Sussex*, 332 Md. 247, 257–258, 630 A.2d 1156, 1161 (1993), and cases there cited. Moreover, the plaintiff must establish these elements by clear and convincing evidence. *Gross v. Sussex, supra,* 332 Md. at 258, 630 A.2d at 1161; *Everett v. Baltimore Gas & Elec.,* 307 Md. 286, 300, 513 A.2d 882, 889 (1986), and cases there cited.

▮ The requirement concerning knowledge of the falsity or reckless indifference as to the truth of the representation means either the defendant's actual knowledge that the representation was false or the defendant's "awareness that he does not know whether the representation is true or false." *Ellerin v. Fairfax Savings, supra,* 337 Md. at 231, 652 A.2d at 1124. Negligence or misjudgment, " 'however gross,' " does not satisfy the knowledge element. *Ellerin,* 337 Md. at 232, 652 A.2d at 1125, quoting *Cahill v. Applegarth,* 98 Md. 493, 502, 56 A. 794, 796 (1904). Thus, "a defendant is liable in a tort action of fraud or deceit only if he knows that his representation is false, or is recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity." *Ellerin,* 337 Md. at 232, 652 A.2d at 1125.

The requirement that the misrepresentation be made with the intent to deceive was described in the leading case of *McAleer v. Horsey,* 35 Md. 439, 453 (1872), as follows:

> " 'An action cannot be supported for telling a bare naked lie, *i.e.,* saying a thing which is false, knowing or not knowing it to be so, and without any design to impose upon or cheat another, and without intention that another should rely upon the false statement and act upon it; but if a falsehood be knowingly told, with an intention that another should believe it to be true and act upon it, and that person does act upon it and thereby suffers damage, the party telling the falsehood is responsible in damages in an action for deceit. . . .' "

Thus, as pointed out in several of our decisions, "recovery in a tort action for fraud or deceit in Maryland is based upon a defendant's deliberate intent to deceive." *Ellerin,* 337 Md. at 230, 652 A.2d at 1124, and cases there collected.

B.

The plaintiff's theory of the case is that the defendants VF and Blue Bell, by Frank Pickard who was in charge of negotiation and consummation of the sale, "affirmatively represented and ... certified that their prior statements of financial condition remained true and complete and that there were no material errors or omissions as of the date of closing." (Plaintiff-respondent's brief in this Court at 17). The plaintiff points out that paragraph 9(h) of the Purchase Agreement signed on October 19, 1990, stated that the Independent Auditor's Report by KPMG Peat Marwick, "[t]o the best of Seller's knowledge, ... fairly present[s] the Company's financial condition and results of operation for the Company's fiscal year ended June 30, 1990." According to the plaintiff, the Independent Auditor's Report was not in fact accurate because it failed to reflect that $107,000.00 in sales and use taxes had been improperly refunded to Wrangler for the fiscal year ending June 30, 1990, and that, for future years, Wrangler would have additional expenses of approximately $107,000.00 per year. The plaintiff argues that this omission was "material." The plaintiff further contends that Frank Pickard gained knowledge of this material inaccuracy when he was told, late in the day on October 22, 1990, of the field audit of Wrangler's sales and use tax filings. Therefore, according to the plaintiff, Pickard made a knowing misrepresentation at the settlement on October 23, 1990, when he signed the certificate stating that the "representations and warranties with respect to the Seller contained in the Purchase Agreement are true, accurate and complete in all material respects." The plaintiff asserts that this misrepresentation was done "intentionally" and that "Pickard intended to induce Wrexham to consummate the purchase ... without any concessions or provisions for satisfying the newly discovered tax claim." (Plaintiff-respondent's brief in this Court at 19).

The defendants VF and Blue Bell, on the other hand, insist that there was no clear and convincing evidence that Pickard had the requisite scienter to support an action for fraud or deceit. Specifically, they contend that there was insufficient

evidence that Pickard knew of any falsity in the certificate signed by him on October 23, 1980, and that there was insufficient evidence that Pickard intended to deceive Wrexham.

■ Our review of the record convinces us, particularly in light of the "clear and convincing" standard of proof, that there was insufficient evidence of either the knowledge element or the intent to deceive element for the tort count to have been submitted to the jury.

The evidence is uncontradicted that Pickard was not aware of the sales and use tax audit until late in the day of October 22, 1990, which was the day before settlement. Pickard testified at the trial as follows:

"Q. And where were you?

A. I would have been in Baltimore and I was probably in the offices of the buyers' law offices.

Q. And were you accompanied by anyone during the closing?

A. Yes. Ernie Choquette who was our counsel was with me.

Q. Anyone else?

A. Not to my recollection. I think we were the only two people.

Q. And so how did you learn anything about the sales and use tax audit?

A. I received a phone call from somebody who I do not recall who it was, but I was advised by phone that there was an issue out there regarding a potential tax.

Q. And what was explained to you about what the sales and use tax issue was?

A. As I understood it, there had been a field auditor who had raised the issue, indicated that there was an estimate of a potential tax of up to $350,000 but that it was not a known amount. This was a potential amount.

I did not know for what time period this involved. I did not know what the components of it were. I really did not know at that point in time whether this was a finite number.

\* \* \*

"So this was the extent of my knowledge at this point in time, that there was a number raised but I did not know anything beyond that.

Q.  So did you make a decision as to whether or not to volunteer this information to Mr. Swernow?

A.  What I did was I knew it was a legal issue and so I did discuss this with counsel.

Q.  That is Mr. Choquette.

A.  With Mr. Ernie Choquette. That's correct. And Ernie basically evaluated the contract, the context of the deal. We talked about it. His advice to me was not to disclose it. He didn't think we had to voluntarily disclose it and his recommendation was not to and I made that decision not to disclose it.

Q.  By not disclosing it did you intend to deceive Wrexham Aviation?

\* \* \*

"THE WITNESS: No. There was absolutely no intent to deceive anybody. In my mind this was a legal issue. It was a question that had come up in the last—just prior to closing and the amount of money was not significant in the context of the total deal.

"So from my perspective since there was a question about whether the amount would ever, in fact, exist down the road, the question was is this something that we need to voluntarily disclose and there was no attempt to deceive anybody. We don't operate that way."

While not able to remember specifically who telephoned him, Pickard testified on cross-examination that Varnell Moore was the person at Wrangler with whom he normally

would communicate. Pickard also testified on cross-examination that he told his counsel, Ernie Choquette, "exactly what I knew about" the field audit of taxes. Pickard reiterated on cross-examination that the amount of money mentioned over the telephone about the field audit was a "potential amount," that he was not told that the field audit was completed, that he was not told "what fiscal year it related to" or what "the components on which the claim for taxes was being based," and that he had no documents. He also reiterated that he did not regard the amount of the potential tax liability material "in the context of this deal. This company has $42,000,000 worth of revenues. It had $46,000,000 worth of expenses. They were losing money. $300,000, $350,000 is not a material amount in the context of this size of a deal. It is no more an amount than an overhaul of an engine."

Pickard further testified that he considered the sale be on an "as is" basis. He identified paragraph 16 of the purchase agreement as support for this view. Paragraph 16, quoted earlier, was a "Due Diligence" clause that provided, *inter alia,* that Wrexham "prior to the date hereof and to its full and complete satisfaction, conducted and completed a due diligence examination of [Wrangler's] business, records, properties and assets, and the liabilities, prospects, affairs, financial position, and results of operations of [Wrangler]." Both Wrexham and VF officials testified that such a clause was highly unusual in a transaction of this nature. Additionally, representatives of Wrexham and Parkway Holdings testified that, contrary to the declaration contained in paragraph 16, they did not undertake such an examination. *Cf. Milkton v. French,* 159 Md. 126, 136–137, 150 A. 28, 33–34 (1930) ("If the plaintiff, under these circumstances [where it was intended that he buy at his own risk], chose to contract without further inquiry, inspection, or warranty, he must accept the situation created by his own choice").

The testimony of the defendants' lawyer at the settlement, Ernest Choquette, corroborated Pickard's testimony. Choquette testified that what Pickard "told me was that there was an audit [of Wrangler] and that they may be looking for a

number around $300,000.00...." Choquette further testified that Pickard had stated that the audit was "in connection with the sales tax for North Carolina," that it was "preliminary," was "in the audit stage," and that there was not a final assessment. Choquette stated that he was not aware of a written report.

The testimony of Varnell Moore, Wrangler's Chief Executive Officer at the time, was also consistent with that of Pickard and Choquette. Moore testified that it was mentioned to him that the

"audit process was complete but I don't remember any details of that and would not have counted that as anything of material significance because I wouldn't grasp from that that meant that there was anything necessarily wrong but would only have to be investigated to determine what further action might be required in the audit.

Q. Do you remember the range of the dollars involved in terms of this assessment?

A. No, I do not.

\* \* \*

Q. What did you do?

A. Well, it seems that I remember mentioning to Frank Pickard, again who was my primary contact at VF Corporation, that the auditors were making an audit and I don't specifically remember but if there was some decision given to my office to me personally that the audit was complete then I likely may have mentioned this to Frank Pickard in a telephone call that the audit is finished and I don't know what the result of this is going to be but since you are in the final stages of negotiating this sale and you are continually asking me about various details almost daily I very likely might have mentioned to him that the audit was complete, but don't have any recall of any significance of that discussion.

Q. Do you recall having any discussion with Mr. Scheevel about this field auditor's report?

A. No, I do not.

Q. Would this have been a matter that you would have told him that you were greatly concerned about?

A. No."

Larry Scheevel's testimony contradicted Moore's in that Scheevel testified that Moore was "very concerned" about the field audit when Scheevel gave Moore the information on the afternoon of October 22, 1990. Nevertheless, neither Scheevel's testimony nor that of any other witness indicated or even suggested an inference that Frank Pickard on October 22nd or October 23rd was told anything more than what was disclosed in the testimony of Pickard, Choquette, and Moore.

Under the plaintiff's theory, Frank Pickard knowingly, with the intent to deceive, made a false representation when he certified at settlement on October 23, 1990, that the representations and warranties in paragraph 9(h) of the October 19, 1990, contract of sale were "true, accurate and complete in all material respects." Paragraph 9(h) of the October 19th contract of sale stated that the Independent Auditor's Report by KPMG Peat Marwick, to "the best of Seller's knowledge ... fairly present[s]" Wrangler's "financial condition and results of operation for the Company's fiscal year ended June 30, 1990." The plaintiff's position is that the Independent Auditor's Report did not fairly represent Wrangler's financial condition for the fiscal year ending June 30, 1990, because of the improper sales and use tax refunds for that fiscal year. Furthermore, the plaintiff contends, and was required to prove by clear and convincing evidence, that Pickard on October 23, 1990, knew that the Independent Auditor's report did not "fairly" present Wrangler's financial position for the fiscal year ending June 30, 1990, because of the tax audit, and knew that the change in financial condition because of that audit was "a material respect."

The direct evidence at the trial totally undermined the plaintiff's theory. Pickard testified that, based on the information given to him over the telephone late in the day on October 22, 1990, he did not know what period of time was

covered by the tax audit and what were the components of the audit. Thus, a far as he knew, the tax audit may not have encompassed the fiscal year ending June 30, 1990. He was informed that the matter was preliminary and not final, and this information clearly turned out to be correct, as the "proposed" notice of tax assessment was not issued by the State of North Carolina until November 1990, and the later final settlement was even much lower than this proposed notice. Pickard also testified that he did not believe that the audit was material, considering the sums involved in relation to a company with over $42 million annual revenues and $46 million annual expenses, and in relation to the sale for $9 million. In light of the figures, his view, on its face, does not seem unreasonable. Pickard's uncontradicted testimony, corroborated by Choquette's and Moore's testimony, refutes the plaintiff's allegation of fraud.

■ The plaintiff concedes that there was a "lack of any direct evidence" that Pickard knew more than was shown by his testimony or that he was told or thought that "the audit was material" and should have been disclosed at the settlement. (Plaintiff-respondent's brief in this Court at 20). The plaintiff, however, asserts that the jury "reasonably disbelieved Pickard when he denied that he knew his representations were false." (*Id.* at 23–24). The jury's prerogative not to believe certain testimony, however, does not constitute affirmative evidence of the contrary. As Judge Rodowsky pointed out for the Court in *Attorney Grievance Comm'n v. Clements,* 319 Md. 289, 298, 572 A.2d 174, 179 (1990), "[a] refusal to believe evidence of a [defendant], however, does not, of itself, supply affirmative evidence of the dishonesty, fraud, deceit, or misrepresentation charged. The issue is whether [the plaintiff] presented sufficient evidence of the charge to meet the clear and convincing standard of proof."

The plaintiff principally argues that the circumstantial evidence was sufficient to show that Pickard committed fraud. The "circumstances" delineated by the plaintiff are as follows (plaintiff-respondent's brief in this Court at 20–22): 1. the

"amount of the recovery claimed in the audit report was more than 15% of the cash consideration for" the sale; 2. "[a]lthough most of the customary warranties and representations had been omitted at Pickard's insistence, Wrexham regarded Wrangler's financial condition as so important" that paragraph 9(h) was inserted into the contract; 3. "Scheevel, Harden and Moore all thought that the amount of the tax claim" was "so critical that it might be a deal breaker, and Pickard . . . was not so stupid as to fail to see what was obvious to everyone else at Wrangler;" 4. Pickard was "a seasoned corporate executive who understood that financial statements must disclose material contingent liabilities;" 5. "If Pickard really thought the audit report would not be a matter of concern to the purchaser, he would not have claimed to have regarded it as a 'legal matter,' but would simply have informed Wrexham about it;" 6. Moore "would hardly have failed to express to Pickard [his] concerns" as shown by "Scheevel's testimony about his conversation with Moore;" 7. "Pickard's testimony that he thought that the question of whether to disclose the tax claim was a 'legal' matter is inherently incredible" since Pickard was familiar with the contract terms.

The above-designated "circumstantial evidence" of fraud constitutes an extremely thin reed upon which to base any inference of fraud on the part of Pickard; it certainly does not amount to clear and convincing evidence. As to the first point relied on by the plaintiff, while the amount of recovery initially claimed by the tax field auditor may have been 15% of the *cash* consideration for the sale, it was a much smaller percentage of the $9 million total consideration. Moreover the amount initially claimed covered a much longer period than the one fiscal year involved in the Independent Auditor's report, and there is no indication that Pickard was aware that it even covered that year. Furthermore, it was clearly not a final figure.

The second point, that the financial condition of the company being sold was important to the buyer, would be true in most instances in which a business was sold. Nevertheless, the financial condition of all businesses are fluid, and, in a

business with $42 million sales in a particular fiscal year, evidence that there was a $107,000 additional expense for that year does not seem particularly material.

Next, neither Harden nor Moore used the phrase "deal breaker" in their testimony about the tax audit. The phrase was used once by Scheevel on the witness stand, when he was testifying about his conversation with Moore late in the afternoon of October 22, 1990. Although Scheevel did clearly testify that Moore was "concerned" about the tax audit, it is not at all clear from Scheevel's testimony that he was saying that he or Moore, on October 22, 1990, considered the audit to be a "deal breaker." One could reasonably read the single reference to "deal breaker" in Scheevel's testimony as his characterization at the time he was testifying. It should be kept in mind that, at the time the sales contract was signed on October 19, 1990, Scheevel contemplated being retained as an official of the plaintiff-owned company, that he did become such an official, and was such an official when he testified. Furthermore, contrary to the plaintiff's assertion, one would not have to be "stupid" to believe that the tax audit information relayed to Pickard was not "critical." [3]

The fact that Pickard was a seasoned corporate executive who understood that financial statements must disclose "*material* contingent liabilities" does not indicate that he believed that the information received by him on October 22, 1990, was "material." Pickard's testimony that whether he should disclose the tax audit information was a "legal matter," and his consultation with Choquette, is neither "inherently incredible" nor any evidence whatsoever of fraud. Whether a

---

**3.** The testimony of one of the plaintiff's chief witnesses suggests that Scheevel's characterization of the field audit as a "deal breaker" was inaccurate. Stuart Heddelman, the Chief Financial Officer of the group of companies controlled by Parkway Holdings, who was present at the settlement on October 23, 1990, testified that sales and use tax audits were "regular" occurrences and the fact that such an audit was taking place would *not* have deterred Wrexham from closing on the purchase of Wrangler. He also testified that an additional $100,000 annual expense "would have ... required a reduction in the purchase price."

contract requires the disclosure of a particular matter is a question of contract interpretation and is properly regarded as a legal matter. Pickard was not a lawyer, and Choquette was. In fact, it would seem obvious that Choquette was present for this very type of advice. Seeking and relying upon the advice of an attorney not only constitutes no evidence of fraud, but it is evidence of the contrary. *See, e.g., Brashears v. Collison,* 207 Md. 339, 350, 115 A.2d 289, 294 (1955) ("Of course the law does not excuse a person in all cases merely because he relied on the opinion of his attorney, but he is not liable in this form of action—which has as its basis actual fraud—when he has acted on the opinion of his attorneys").

Finally, the plaintiff's view that Moore must have told Pickard everything that Scheevel testified that he told Moore, is nothing more than an attack upon Moore's, Pickard's, and Choquette's credibility. It mounts to little or no affirmative evidence of fraud on the part of Pickard.

The circumstantial evidence, instead of showing that Pickard knew more about the tax audit than the direct testimony would indicate, actually suggests that those associated with the plaintiff were likely to have known more about the tax audit problem than Pickard knew.

The field audit revealed that Wrangler had applied for, and received, sales and use tax refunds to which it was not entitled for the period of May 1, 1988, through June 30, 1990. Throughout all but the last month of this period, Wrangler's Chief Executive Officer was Robert Faia who resumed that position following Wrexham's purchase of Wrangler. He owned twenty percent of Wrexham and was present with Wrexham's negotiating team in October 1990. In his role as CEO Faia was intimately involved in Wrangler's operations, including the method of reporting and applying for refunds of the sales and use taxes which were misapplied for.

At trial Harden was asked if he had ever had a conversation with Faia about the handling of the payment of sales and use taxes and replied that Faia directed him to report these items in a very specific manner. Harden stated that, prior to the

conversation with Faia, he was not in the practice of accruing unreceived refunds. This changed in August 1988, however, because Faia "asked [Harden] to go ahead and accrue [the sales and use tax] refunds on the books to make the financial picture look better...." Harden explained that accounting for the refunds in this manner reduced the company's expenses and resulted in a better net profit.

The field auditor for North Carolina worked in a trailer at the Wrangler headquarters in North Carolina during August, September and October 1990. The testimony shows that his presence at the headquarters was no secret. During the same period, Faia had an office at the headquarters and he was periodically in his office. Moreover, Harden and Scheevel, who know more about the field audit and the auditor's report than anyone else associated with the parties, were never officials of VF or Blue Bell but were officials of Wrangler when it was owned by W.A. Services, Inc. They were demoted "one step" when VF and Blue Bell took back Wrangler in May 1990. Both remained officials of Wrangler after the sale on October 23, 1990, and Scheevel was promoted to his former position. Scheevel testified that he had discussions with various officials associated with the plaintiff Wrexham prior to the sale of Wrangler on October 23, 1990, although he stated that these officials did not ask him "any questions about the Company's assets or liabilities."

The circumstantial evidence in this case, when viewed as a whole, suggests that those connected with the plaintiff knew more about the tax field audit prior to October 23, 1990, than was known by Frank Pickard. Whether or not this is true, however, the evidence when viewed in its entirety does not establish, clearly and convincingly, a prima facie case of fraud on the part of Frank Pickard.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART, AND CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY FOR COM-*

*PENSATORY DAMAGES UNDER THE BREACH OF WARRANTY COUNT AND TO REVERSE THE JUDGMENTS OF THAT COURT FOR COMPENSATORY AND PUNITIVE DAMAGES UNDER THE TORT COUNT AND TO ENTER JUDGMENT FOR THE DEFENDANT ON THE TORT COUNT. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT.*