REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1687

September Term, 2014

_____


JAN CRYSTAL

v.

MIDATLANTIC CARDIOVASCULAR
ASSOCIATES, P.A., ET AL.

_____

Krauser, C.J.,
Berger,
Leahy,

JJ.

_____

Opinion by Krauser, C.J.

_____

Filed:  March 29, 2016


*Arthur, Kevin, J. did not participate in the
Court's decision to report this opinion pursuant
to Md. Rule 8-605.1.

Jan Crystal, appellant, filed a claim with the Health Care Alternative Dispute Resolution Office, against appellees: Midatlantic Cardiovascular Associates, P.A. ("Midatlantic"); St. Joseph Medical Center, Inc. ("SJMC"); and Mark G. Midei, M.D. ("Dr. Midei"), based upon the implantation of an allegedly unnecessary stent in Crystal's left anterior descending coronary artery (which we shall, as the parties do, refer to as the "LAD.") When arbitration was waived, Crystal filed a complaint in the Circuit Court for Baltimore County, alleging medical malpractice, fraud by intentional misrepresentation, and fraud by concealment.[1] The claim of medical malpractice was alleged as to all three health care providers, but the claim of fraud by misrepresentation was brought against only Dr. Midei, and the claim of fraud by concealment was directed at only SJMC.

After discovery was concluded by the parties, the circuit court granted appellees' motions for summary judgment, concluding that there was no evidence to support Crystal's claim of fraud by intentional misrepresentation, against Dr. Midei, or his claim of fraud by concealment, against SJMC. It, then, as a consequence of having disposed of Crystal's fraud claims, granted summary judgment as to his remaining medical malpractice claims against Midatlantic, SJMC, and Dr. Midei, as Crystal's fraud claims, having been disposed

---

[1] Initially, Crystal's complaint alleged six claims. The first three—medical malpractice (count I, against Midatlantic, SJMC, and Dr. Midei), intentional misrepresentation (count II, against Dr. Midei), and fraudulent concealment (count III, against SJMC)—are the subject of this appeal, as the circuit court granted summary judgment, on all three of these claims, in favor of appellees. The three other claims— negligent hiring and retention (count IV, against Midatlantic), negligent supervision (count V, against Midatlantic), and loss of consortium (count VI, against Midatlantic, SJMC, and Dr. Midei)—were dismissed by the court, without prejudice, following the hearing on appellees' motions for summary judgment, and are not relevant to this appeal.

of on summary judgment, could no longer be deemed to have tolled the statute of limitations, which had long since run on his medical malpractice claims.

From those rulings, Crystal noted this appeal, contending that the court had erred in granting appellees' motions for summary judgment as to all of his claims, and thus his claims of fraud and medical malpractice should be resurrected by this Court. For the reasons set forth below, we shall affirm.

## I.

## Background

In October of 2004, after experiencing chest pain, shortness of breath, and a feeling of tightness in his chest, Crystal underwent a "cardiac catheterization,"[2] a procedure used to evaluate and diagnose cardiovascular conditions. During that procedure, it was discovered that there was a "stenosis"—that is, an abnormal narrowing[3]—of Crystal's LAD. The level of stenosis in that artery had reached 95%. To address that condition, a stent was placed in Crystal's LAD.

---

[2] A cardiac catheter is a catheter "that can be passed into the heart through a vein or artery" to, among other functions, "inject contrast media." *Stedman's Medical Dictionary* 327 (28th ed. 2006). The procedure is used "mainly in the diagnosis and evaluation of congenital, rheumatic, and coronary artery lesions and to evaluate systolic and diastolic cardiac function." *Id.*

[3] Stenosis is a "stricture of any canal or orifice." *Stedman's Medical Dictionary* 1832 (28th ed. 2006).

2

Yet, notwithstanding the successful completion of that procedure, Crystal continued to experience shortness of breath. Consequently, his cardiologist recommended that he undergo another cardiac catheterization. That second catheterization was to be performed by appellee, Dr. Midei, a cardiologist with appellee, Midatlantic.[4]

Before undergoing this procedure, however, Crystal signed, on November 4, 2004,[5] a "Cardiac Catheterization Laboratory Procedure Consent Form," which authorized Dr. Midei "to perform one or more" of a number of medical procedures, including a "heart catheterization," a "coronary angiography," and a "stent implantation." Specifically, it stated, in pertinent part:

> I consent to and authorize Dr. Mark Midei and his/her assistants to perform one or more of the following procedures:
>
> Heart catheterization and coronary angiography, possible coronary angioplasty-type procedures (angioplasty, atherectomy, stent placement . . .), and possible peripheral angiography. Please read the explanations below.
>
>       \* \* \*
>
> **Heart catheterization with coronary angiography** is a diagnostic procedure to define the presence, nature, and extent of heart disease. The physician inserts a small tube or catheter into an artery and/or vein in the leg or arm and advances it to the heart. The physician will inject dye through the catheter, take pictures of the arteries or grafts to the heart, and measure pressures in the heart. The results of this test will help determine if medication, an angioplasty-type procedure, or bypass surgery is the best treatment.

---

[4] Pursuant to an agreement between Midatlantic and SJMC, Dr. Midei served as the director of SJMC's cardiac catheterization "lab."

[5] This consent form was signed, by Crystal, prior to the medical procedure in question, on November 4, 2004. Another consent form, not relevant to this appeal, was signed on the day of the procedure, November 22, 2004.

3

* * *

**Coronary or peripheral angioplasty-type procedures** (angioplasty, atherectomy, stent placement) are therapeutic procedures to open blockages in coronary or peripheral arteries or bypass grafts. The physician will perform coronary or peripheral angiography, then advance a thin guidewire across the blockage and then select the most appropriate procedure(s) to open the blockage . . . . Stent implantation is a procedure where the physician inserts a metal stent (mesh-like tube) at the site of the blockage which is left in place to hold the artery open.

* * *

Notably, the form did not contain any requisite degree of blockage that would require or preclude the implantation of a stent, but instead left the decision, of whether to place a stent, to the medical judgment of Dr. Midei.

Notwithstanding Crystal's pre-operative consent to the procedure, it was Crystal's claim that Dr. Midei, though not required to do so, informed him, during the course of the procedure, but before the implantation of the stent, of the level of stenosis in his LAD. According to Crystal, Dr. Midei, before placing the stent, advised him, as he lay on the operating table, that the stenosis in question had reached 70% (though the laboratory report he later prepared suggested an even higher level of stenosis, that is, 80%) and that he would need a stent to avoid a complete blockage of the artery. Dr. Midei then placed another stent in Crystal's LAD.

At his deposition, nearly ten years later, Crystal, in recalling the deliverance of that advisement by Dr. Midei, testified as follows:

[Counsel]: Prior to the beginning of the cardiac catheterization procedure that [Dr. Midei] performed on November 22, do you remember talking to him?

4

[Crystal]: Just in the lab.

[Counsel]: I understand. On that morning before he started the catheterization procedure, do you remember talking to Dr. Midei?

[Crystal]: No.

[Counsel]: Do you remember someone going over a consent form with you?

[Crystal]: I don't recall.

[Counsel]: Do you know if you signed a consent form?

[Crystal]: I don't recall. I am sure I had to, but I don't recall.

[Counsel]: What do you remember Dr. Midei saying during the procedure, if anything?

[Crystal]: He pretty much started the same way that Dr. Brinker did. I'm going to do this. You're going to feel that. And it wasn't long into the procedure that he told me I had a 70 percent blockage in my LAD. Now those letters sounded pretty familiar to me.

[Counsel]: Okay you remember him saying anything else?

[Crystal]: You would need this stented to keep it from blocking completely.

[Counsel]: Are you paraphrasing what you remember that he told you or are those Dr. Midei's exact words?

[Crystal]: I can't remember back 10 years. So I'm assuming. I'm paraphrasing.

Five years after the stent implantation at issue, in 2009, Crystal read a newspaper article suggesting that Dr. Midei had been performing "unnecessary" stent implantation procedures. That article led Crystal to contact an attorney. Two years later, in 2011, almost seven years after the stent implantation procedure had been performed by Dr. Midei, Crystal filed a claim, with the Health Care Alternative Dispute Resolution Office, against

5

the three appellee health-care providers. Crystal filed, with that claim, a certificate of qualified expert, naming Herbert Fischer, M.D., as that expert, and Dr. Fischer's report. In both the certificate and his report, Dr. Fischer opined that Dr. Midei had breached the standard of care applicable to stent implantation procedures by implanting a stent when there had been "insufficient evidence to justify" such a procedure. Arbitration was thereafter waived, and the case was transferred to the Baltimore County circuit court.

### Summary Judgment Proceedings

In the Baltimore County circuit court, appellees subsequently moved for summary judgment, contending that Crystal had failed to generate a dispute of material fact as to his claims of fraud by intentional misrepresentation and fraud by concealment. And, because, in their view, there was no evidence of fraud, the five-year medical malpractice statute of limitations, which had long since run on Crystal's medical malpractice claims, had not been tolled by those fraud claims and, therefore, those medical malpractice claims should be dismissed, by the court, as time-barred.

Crystal responded to appellees' motions by asserting that there was a dispute of material fact as to, at least, his claim of fraud by intentional misrepresentation because there was evidence that Dr. Midei had "deliberately misled" Crystal to induce him to undergo the stent implantation procedure in question. That evidence, Crystal pointed out, was Dr. Fischer's deposition testimony that, at the time Dr. Midei implanted the second stent, the level of arterial stenosis was "about a 30 percent stenosis at the maximum,"

6

though, at the same deposition, he later increased that estimate of stenosis to 30-40%.[6] And that testimony, noted Crystal, contradicted Dr. Midei's statement that Crystal had a 70% stenosis in his artery, as well as Midei's subsequent description of an 80% stenosis in his laboratory report. "A jury could readily conclude" from that "large discrepancy," avowed Crystal, that Dr. Midei "knew at the time of the stent implantation that there was nowhere near" a 70% or 80% stenosis and that he "deliberately misled" Crystal by so stating and thereby inducing Crystal to undergo the stent implantation procedure.

Such evidence, Crystal further asserted, created a "jury question" as to whether Dr. Midei committed fraud, by misrepresenting the actual level of stenosis in Crystal's LAD, which, if proved, would toll the statute of limitations as to his medical malpractice claim. Crystal then urged the court to deny summary judgment as to his claim of fraud by concealment, which was alleged solely as to SJMC, because the medical center was, he claimed, "[vicariously] liable for the fraudulent concealment acts of Dr. Midei."[7]

The circuit court, following a hearing on appellees' motions, granted summary judgment, as to all three counts. In so doing, the court explained that, as to the claim of

---

[6] During his deposition, Dr. Fischer opined that there was about a 30% stenosis of Crystal's LAD. Later in that deposition, however, Dr. Fischer drew a diagram showing the area of the stenosis shown on the angiogram. In that diagram he wrote his estimate of the stenosis as "20-(30-40% max)."

[7] In making that request, Crystal abandoned the allegation that he originally made in his complaint, where he asserted that SJMC "had a duty to disclose" to Crystal, Dr. Midei's purported "history of negligently and fraudulently advising patients to undergo unnecessary stent procedures and/or negligently and fraudulently placing stents in patients without proper consent."

fraud by misrepresentation against Dr. Midei, it was not persuaded by Crystal's contention that the "difference of opinion" between Dr. Fischer and Dr. Midei, regarding the level of stenosis in his LAD, constituted evidence that Dr. Midei had, knowingly or with reckless indifference, made a false statement to Crystal with respect to that level. It therefore granted summary judgment as to that count, because Crystal, in its view, had "failed to proffer evidence of a genuine issue for trial on: whether Dr. Midei knowingly made a false representation; whether he intended to defraud Mr. Crystal; and/or whether Mr. Crystal relied on misrepresentations by Dr. Midei in consenting to the procedure."

The court also explained that it was granting summary judgment as to the claim against SJMC for fraud by concealment because: First, it was "not aware of any authority for the proposition that SJMC or any health care provider, generally, has a duty to disclose to patients prior instances of medical malpractice," and, second, "even if [SJMC] had a duty to disclose this information, there is no evidence that [SJMC] had information to disclose at the time of Crystal's procedure." Then, given "the absence of sufficient evidence of fraud," the court determined that the five-year statute of limitations period had run on Crystal's medical malpractice claims, having not been tolled by fraud, and dismissed those claims as time-barred.

## II.

### Standard of Review

Maryland Rule 2-501 provides that summary judgment shall be entered "in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." In other words, the circuit court must first determine "whether there is a dispute as to a material fact sufficient to require the issue to be tried." *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 93 (2000). If there is no such dispute and if the nonmoving party has "failed to make a sufficient showing on an essential element" of its claim, for which it has the burden of proof, summary judgment is then appropriate in favor of the movant. *Cent. Truck Ctr. Inc. v. Cent. GMC, Inc.*, 194 Md. App. 375, 386 (2010) (internal citation and quotation marks omitted)

In assessing the propriety of a grant of summary judgment, we apply a *de novo* standard of review. *River Walk Apartments LLC. v. Twigg*, 396 Md. 527, 541 (2007). In conducting that assessment, we consider the facts and all reasonable inferences that may be drawn from those facts, in a light most favorable to the nonmoving party. *Frederick Rd. Ltd. P'ship*, 360 Md. at 93-94. Our review is limited, however, solely to the grounds upon which the circuit court granted summary judgment. *River Walk Apartments*, 396 Md. at 541–42.

### III.

### Fraud By Intentional Misrepresentation

Crystal contends that the circuit court erred in granting summary judgment as to his claim of fraud by intentional misrepresentation against Dr. Midei. Specifically, he maintains that there was a genuine issue of material fact as to whether Dr. Midei had deliberately misstated, or had done so with reckless indifference, the degree of stenosis in Crystal's LAD, so as to induce Crystal to agree to the stent implantation procedure that was ultimately performed. In support of that claim, he suggests that there was "too great a discrepancy" between Dr. Midei's and Dr. Fischer's opinions about the percentage of stenosis in Crystal's LAD for Dr. Midei's statement, that there was a 70% stenosis, to have been anything but an intentional misrepresentation of the level of stenosis to induce Crystal to undergo the stent implantation procedure at issue.

To prevail on a claim of fraud, a plaintiff must show, "by clear and convincing evidence," the following elements, the second of which we have bolded as it is central to this appeal:

> 1. That the defendant made a false representation to the plaintiff;
> **2. That its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;**
> 3. That the misrepresentation was made for the purpose of defrauding the plaintiff;
> 4. That the plaintiff relied on the misrepresentation and had the right to rely on it; and
> 5. That the plaintiff suffered compensable injury resulting from the misrepresentation.

> *E.g. VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 703-04 (1998) (emphasis added).

10

It is, as noted, the second element (or the "knowledge element") of fraud that is at issue here. Thus, the question before us is: Did Crystal present sufficient evidence to generate a genuine dispute of material fact as to whether Dr. Midei knew that the statement he made to Crystal was false or that Dr. Midei was "recklessly indifferent" with respect to the truthfulness of that statement. In addressing that question, we are guided by the principle that "[n]egligence or misjudgment, however gross, does not satisfy the knowledge element" of fraud. *VF Corp.*, 350 Md. at 704 (internal quotation marks and citation omitted).

Crystal's claim of fraud by intentional misrepresentation rests entirely on the competing diagnoses of Dr. Midei, Crystal's treating cardiologist, and Dr. Fischer, Crystal's "qualified expert." In both the certificate of qualified expert and the report, accompanying that certificate, which were filed with Crystal's claim, Dr. Fischer opined that Dr. Midei had breached the standard of care by placing a stent "without reasonable evidence that [it] was medically necessary." In reaching that conclusion, Dr. Fischer reviewed Crystal's medical file "regarding the catheterization and stent placement by Dr. Midei," including the angiogram for that procedure. He deponed that, in reviewing the angiogram, he did not "see anything that would even come close" to the percentage of stenosis Dr. Midei had recorded. According to Dr. Fischer, Crystal's LAD had about a 30 to 40% stenosis, not the 70% indicated by Dr. Midei. "[Y]ou never treat coronary artery disease with stents," Dr. Fischer declared, "unless there is severe stenosis." But, at no time did he specify what level of stenosis constitutes "severe stenosis" or what a reasonable

11

margin of error might be in reading an angiogram with the naked eye, the only available tool for making such an assessment at that time.

A "plaintiff obviously does not establish" fraud by merely showing that "objectively false representations about the diagnosis and treatment" were made. *Geisz v. Greater Balt. Med. Ctr.*, 313 Md. 301, 330 (1988). Fraud, as noted, does not "encompass liability for negligent or grossly negligent representations." *Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 238–39 (1995). Similarly, the Court of Appeals has instructed that "the fraud exception" to the statute of limitations, upon which Crystal relies in support of his contention that the limitations on his medical malpractice claims had been tolled, "cannot be satisfied by evidence which demonstrates no more than negligence." *Geisz*, 313 Md. 301 at 328.

Crystal has provided no evidence that Dr. Midei knew his assessment of stenosis, whether it be 70 or 80%, was incorrect. The disparity between Dr. Fischer's testimony and the statements made by Dr. Midei suggests, at most, that Dr. Midei may have been negligent, perhaps even grossly negligent, in his diagnosis. And, as observed earlier, "a difference of opinion concerning the applicable standard of care" is insufficient to establish fraud. *Geisz*, 313 Md. at 330.

Crystal further suggests that an inference of fraud can be drawn from the discrepancy between Dr. Midei's statement during catheterization, when he stated there was a 70% stenosis, and his laboratory report, which stated that the level of stenosis was 80%. The difference in the two evaluations by Dr. Midei was evidence, Crystal claims, that Dr. Midei knew that his assessment of 70% was false.

12

But there was no evidence that that discrepancy reflected anything more than a mistake made by Dr. Midei in recalling the level of stenosis shown by the angiogram, or a transcription or dictation error, or a misunderstanding by Crystal about what Dr. Midei had originally said, during the procedure, regarding the level of stenosis, or, perhaps, a lapse in memory when, during his deposition, Crystal "paraphrased" what Dr. Midei had said to him many years before. In any event, the mere difference between Dr. Midei's statement to Crystal during the procedure and the number recorded in the report does not, without more, permit a reasonable inference to be drawn that Dr. Midei knew his assessment of 70% stenosis was too high. In fact, it may suggest that Dr. Midei believed the level of stenosis in Crystal's LAD was at least 70 percent if not more.

Unable to show that Dr. Midei knew his assessment of 70% stenosis was false, Crystal's only remaining option was to present evidence showing that Dr. Midei was recklessly indifferent to the truth of his assessment. In our view, there was no evidence that he was. The difference of opinion, as we explained, may have been the result of a mistake or of a misjudgment amounting to negligence or even gross negligence, but there was no evidence of fraud.

But, Crystal cites *Geisz v. Greater Baltimore Med. Ctr.*, 313 Md. 301 (1988), for a contrary proposition. Steven Geisz had been diagnosed with "Hodgkin's disease," a form of cancer. *Geisz*, 313 Md. at 305. His physician, George Richards, M.D., directed that Geisz receive several courses of radiation and chemotherapy treatments. *Id.* at 309. Unfortunately, after receiving those treatments, Geisz succumbed to that disease. *Id.* at 304.

13

Nearly ten years after his death, Geisz's former wife[8] read a newspaper article, detailing medical malpractice actions that had been filed, by other patients of Dr. Richards, against him. *Id.* at 306. "As a result of her having read [this] newspaper article," Geisz's former wife brought a wrongful death action, on behalf of their son, against Dr. Richards and the Greater Baltimore Medical Center, alleging medical malpractice, for courses of treatment that were "improperly conceived and administered." *Id.* at 304–07.

Although the limitations period, on its wrongful death claim, appeared to have run, the estate maintained that it had not because it had been tolled by fraud. *Id.* at 307-08. The fraud alleged by the estate was that Dr. Richards had misrepresented to Geisz and his former wife that "he had given [Geisz] every treatment available in the country, the best of treatments," but for some reason Geisz had not responded to those remedial measures, when, in fact, the courses of treatment received by Geisz "from technicians acting at the direction of, and under the supervision of Dr. Richards, courses of treatment which the plaintiffs allege were improperly conceived and administered." *Id.* at 306-11. This statement, Geisz's estate claimed, "kept [the estate] in ignorance of the cause of action" that it may have had against Dr. Richards and the medical center. *Id.* at 307-08.

The defendant doctor and the medical center then moved for summary judgment, contending that the claim was time-barred and that the statement at issue, made by Dr. Richards, did not amount to fraud. *Id.* at 308. In response, the estate, in an attempt to show

---

[8] Steven Geisz "had obtained a divorce" from his former wife, Elaine Geisz, a few months before his death. *Id.* at 305.

14

that the statement was made fraudulently, presented the deposition testimony of Dr. Richards, from another malpractice case pending against him. *Id.* at 311-12. In that deposition, Dr. Richards made statements suggesting, by implication, that "portal films," that he had requested, may not have been done in the course of Mr. Geisz's treatment, which were necessary in determining whether the dispensed radiation had "reach[ed] into the areas . . . intended for radiation." *Id.* at 312.

Geisz's estate also presented reports, from its medical experts, stating that, in Geisz's case, the "treatment plans, calculations of dosages, and portal films were not done." *Id.* at 313. This evidence, the estate suggested, showed that Dr. Richards had no factual basis for his statement to Steven Geisz and his former wife, assuring them that he had given Geisz the best possible treatment—a statement the estate relied upon in contending that the statute of limitations had been tolled on their claims by fraud. *Id.* at 307-08.

After the circuit court granted summary judgment in favor of the defendants, the Court of Appeals reversed that judgment, holding that the estate's evidence generated a "fact question" of "whether Dr. Richards had a basis for representing that the particular cancer in Geisz had been treated, but for some inexplicable reason had withstood treatment." *Id.* at 332. The Court observed that the estate had presented evidence that it was "impossible for Dr. Richards to determine whether the desired treatment had actually been received," despite his statements to Geisz that he had given him every available treatment. *Id.* at 333–34. That evidence, if believed, "could support," declared the Court, "a finding of reckless indifference to the truth" and thus a claim of fraud. *Id.* at 334.

15

But *Geisz* is clearly distinguishable from the instant case. Unlike what occurred in Geisz, Dr. Midei did not tell Crystal that he had a 70% stenosis in his LAD without the appropriate test, nor did Dr. Midei make that statement while foregoing other necessary tests to establish the level of stenosis. Instead, Crystal's claim of reckless indifference rests entirely on the supposition that Dr. Midei was wrong—perhaps very wrong—in his assessment of the level of stenosis. But, as stated previously, evidence of negligence, "however gross," does not rise to the level of reckless indifference necessary to establish fraud. *VF Corp.*, 350 Md. at 704 (internal citations omitted).

Moreover, it is worth noting several ways in which Dr. Fischer's testimony clearly stops short of crossing the threshold from negligence into gross negligence, let alone fraud. First, Dr. Fischer did not explain what the boundaries of stent-requiring stenosis are, that is, at what percentage of blockage should a doctor begin to consider placing a stent. Thus, while Dr. Fischer did opine that Dr. Midei's assessment of the stenosis fell below the standard of care, it is unclear exactly how unreasonable that assessment was. Second, although Dr. Fischer stated that "you never treat coronary artery disease with stents unless there is severe stenosis," he never indicated what minimum percentage of blockage constitutes "severe" stenosis. Third, there is presumably a margin of error involved when a doctor estimates the percentage of stenosis in an artery from an angiogram, particularly

16

where that evaluation is performed, as was the case here, by the naked eye.[9] But, Dr. Fischer did not explain what that typical margin of error would be. Fourth and finally, Dr. Fischer offered no opinion as to Crystal's prior medical history and whether his prior instances of severe stenosis would lower the level at which a doctor would recommend the implantation of a stent.

In sum, although the inference could be drawn, from the evidence presented below that negligence had occurred, that has no bearing on Crystal's fraud claim. Fraud requires knowledge of the falseness of the statement, or at least a reckless indifference as to the truthfulness of the statement made by the defendant, whereas negligence does not. And, without evidence that Dr. Midei knowingly misstated the percentage of stenosis in Crystal's LAD, or that he was recklessly indifferent to what that percentage of stenosis was, Crystal's claim of fraud by misrepresentation could not withstand summary judgment and thus the circuit court did not err in granting that judgment.

---

[9] The issue of "interreader variability" was raised at the hearing that was held on the motions for summary judgment. "Interreader variability," as explained by the circuit court, assumes that different experts "will have a variability in their reading of the stenosis by up to 20 percent," such that one expert reviewing an angiogram could see a stenosis of 60% while another expert reviewing the same angiogram could see a stenosis of 80%. For the purpose of the motions for summary judgment, Crystal refused to concede "that there [was] a 20 percent interreader variability" in this case, but he did not dispute that "interreader variability" is always a factor in such matters.

17

# IV.

## Fraud By Concealment

We turn now to Crystal's contention that the circuit court erred in granting summary judgment, in favor of SJMC, on his claim that the medical center had committed fraudulent concealment by not disclosing Dr. Midei's purported history of negligence and fraud. In addressing this issue, we begin with a brief description of Crystal's inconsistent, and somewhat confusing, assertion of that claim. Crystal alleged, in his complaint, that SJMC was liable for fraud by concealment because, prior to his procedure in 2004, the medical center had "actual knowledge that Dr. Midei was negligently and fraudulently advising his patients to undergo unnecessary stent procedures." Then, later in his complaint, Crystal stated that SJMC had a "duty to disclose" such information to Crystal, but failed to do so. After discovery, however, Crystal, in his response to appellees' motions for summary judgment, offered a different theory of liability, stating that "SJMC is liable for the fraudulent concealment acts of Dr. Midei."

The circuit court properly granted summary judgment as to the claim of fraud by concealment. In so doing, the court understandably chose to address only the theory of liability in Crystal's complaint, because, as that court put it, it was "not aware of any authority for the proposition that SJMC or any health care provider, generally, has a duty to disclose to patients prior instances of medical malpractice." It then added that "even if [SJMC] had a duty to disclose this information, there is no evidence that [SJMC] had information to disclose at the time of Crystal's procedure."

18

On appeal, Crystal concedes, in his brief, that "the court properly found that there was no evidence that SJMC was on notice of Dr. Midei's pattern of negligence or fraud prior to [his] surgery" and that the court was correct in stating that "there is no evidence that [SJMC] engaged in any misconduct, should have known about misconduct, or should have investigated any misconduct at the time of [the 2004 procedure]." Nevertheless, Crystal now contends, as he did in his response to the motion for summary judgment but not in his complaint, that the circuit court erred in granting of summary judgment as to the claim of fraud by concealment because "the asserted basis of liability by SJMC under [fraud by concealment] was the vicarious liability of SJMC for its employee, Dr. Midei,-- not SJMC's own failure to act."

We decline to address Crystal's suggestion, on appeal, that SJMC was vicariously liable for Dr. Midei, as that theory of liability contradicts what Crystal stated in his complaint. Instead, we review the circuit court's grant of summary judgment based upon the grounds relied upon in the record. To prevail on a claim of fraudulent concealment, a plaintiff must show that

> (1) the defendant owed a duty to the plaintiff to disclose a material fact;
> (2) the defendant failed to disclose that fact; (3) the defendant intended
> to defraud or deceive the plaintiff; (4) the plaintiff took action in
> justifiable reliance on the concealment; and (5) the plaintiff suffered
> damages as a result of the defendant's concealment.

*Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 138 (2007) (internal citations omitted). "A fraudulent concealment claim is caused, in part," the Court of Appeals has said, "by the intentional failure to warn. *Lloyd*, 397 Md. at 138-39. It is clear that the circuit court properly granted summary judgment because there was no evidence, as even Crystal

19

concedes, that SJMC knew or should have known about Dr. Midei's alleged prior misconduct.

## V.

### Medical Malpractice

Finally, we turn to Crystal's remaining contention that the circuit court erred in granting summary judgment as to his medical malpractice claims. Although, Crystal concedes that he did not file his complaint within the required five-year statute of limitations period,[10] he believes that his claim, contrary to the circuit court's finding, was not time-barred because it was tolled by a showing of fraud under § 5-203, of the Courts and Judicial Proceedings Article of the Maryland Code.

That tolling provision provides: "If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud." Md. Code Ann., Cts. & Jud. Proc. § 5-203. The alleged fraud, Crystal maintains, was Dr. Midei's purported misrepresentation, during the procedure, about the 70% level of stenosis in Crystal's LAD. But, as previously discussed, Crystal did not present any evidence that Dr. Midei made what could be found to be a fraudulent

---

[10] Md. Code Ann., Cts. & Jud. Proc. § 5-109 states, in relevant part, that an "action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider, as defined in § 3-2A-01 of this article, shall be filed within the earlier of: (1) Five years of the time the injury was committed . . ."

20

statement to induce the stent implantation at issue. Therefore, without any evidence of fraud that would toll the statute of limitations, the circuit court was impelled to find, as it did, that Crystal's remaining medical malpractice claims were time-barred.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**