PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JKC HOLDING COMPANY LLC,
                    *Plaintiff-Appellee,*

v.

WASHINGTON SPORTS VENTURES,
INCORPORATED,
                    *Defendant-Appellant,*

and

WFI GROUP, INCORPORATED, formerly
known as Jack Kent Cooke,
Incorporated; THE ESTATE OF JACK
KENT COOKE,
                    *Defendants-Appellees,*

and

GREGORY R. DILLON; MARK POLLAK;
HOWARD B. SOLOWAY,
                    *Defendants.*

No. 00-2511

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-00-35-A)

Argued: June 5, 2001

Decided: September 7, 2001

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge,
and Irene M. KEELEY, Chief United States District Judge
for the Northern District of West Virginia,
sitting by designation.

Affirmed by published opinion. Chief Judge Keeley wrote the opinion, in which Chief Judge Wilkinson and Judge Niemeyer joined.

---

**COUNSEL**

**ARGUED:** David Boies, BOIES, SCHILLER & FLEXNER, L.L.P., Armonk, New York, for Appellant. Paul J. Mode, Jr., WILMER, CUTLER & PICKERING, Washington, D.C., for Appellees. **ON BRIEF:** Alan B. Vickery, Christopher M. Green, BOIES, SCHILLER & FLEXNER, L.L.P., Armonk, New York; Jonathan D. Schiller, Carol J. Nichols, BOIES, SCHILLER & FLEXNER, L.L.P., Washington, D.C., for Appellant. David P. Donovan, Melanie D. Coates, Laura B. Kotanchik, Joshua R. Stebbins, WILMER, CUTLER & PICKERING, Washington, D.C.; Thomas C. Green, Mark D. Hopson, Griffith L. Green, Kristin Graham Koehler, SIDLEY & AUSTIN, Washington, D.C., for Appellees.

---

**OPINION**

KEELEY, Chief District Judge:

In this case we are asked to determine whether JKC Holding Company LLC ["JKC Holding"] engaged in wrongdoing to prevent the sale of the Washington Redskins professional football team to Washington Sports Ventures, Inc. ["WSV"]. WSV failed in its attempt to purchase the Redskins from the Estate of Jack Kent Cooke and alleges a variety of claims, including breach of contract and fraudulent inducement against JKC Holding. Because of the speculative nature of the evidence on which WSV relies, we affirm the district court's grant of summary judgment to JKC Holding.

I.

At the time of his death in April 1997, Jack Kent Cooke held 90% of the shares of JKC, Inc., which in turn owned the Washington Redskins, Jack Kent Cooke Stadium and the Redskins' training facility in Virginia. His son, John Cooke, Sr. ["Cooke"], owned the remaining

10% of the shares. Jack Kent Cooke's will provided that his estate ["Estate"] was to sell his stock in JKC, Inc. and use the proceeds to fund a charitable foundation benefitting underprivileged youth. Cooke was one of the executors of the Estate, as well as a director of JKC, Inc. and JKC Holding, which was formed for the purpose of selling the team and its related assets. A Special Committee, consisting of all of the JKC, Inc. directors except Cooke, was created to oversee the sale. Cooke recused himself from sitting on the Special Committee because he wished to bid on the team himself.

After a controlled auction for the stock, which began in September 1998 and ended in January 1999, the Special Committee accepted an $800 million bid from WSV, a group of investors led by Howard P. Milstein ["Milstein"], his brother Edward L. Milstein, and Daniel Snyder ["Snyder"]. Cooke and his group of investors had offered the second highest bid of $725 million.

On January 9 and January 10, 1999, representatives of the Special Committee and WSV met to finalize the Stock Purchase Agreement ["Agreement"]. Prior to the exchange of signature pages, representatives of the Special Committee advised WSV's representatives that Cooke was disappointed, upset and emotional over the pending sale of the Redskins to WSV, but stated that they thought he would get over his disappointment. WSV's representatives have testified they understood that Cooke was potentially hostile to WSV's bid and that the transaction could fail as a result. Importantly, the Special Committee gave WSV time to reconsider proceeding with the Agreement in light of this information. Nevertheless, WSV decided to proceed, and the signature pages were signed and exchanged on January 10, 1999.

The Agreement between the parties is 64 pages in length and teams of lawyers participated in the negotiations of its terms. It conditioned the sale of stock upon WSV obtaining the approval of the National Football League ["NFL"] for its ownership of the Washington Redskins. The parties agreed to "consult and use commercially reasonable efforts to make or obtain all Approvals as soon as is reasonably practicable after execution of this Agreement." Art. VII, §7.2.

Each party was contractually obliged to use its best efforts to secure NFL approval for WSV. In addition, WSV was required to

provide a $30 million irrevocable letter of credit, which JKC Holding could exercise if a "Deposit Forfeiture Event" occurred. Under the Agreement, the following three conditions must exist for a "Deposit Forfeiture Event" to occur: (1) the Agreement was terminated prior to the closing date, in accordance with the termination provisions set forth in Section 9.1 of the Agreement;[1] (2) the Agreement was terminated prior to WSV obtaining NFL approval to own the Redskins; and (3) the NFL Commissioner did not advise JKC Holding in writing that the reason WSV did not obtain NFL approval was solely due to problems with JKC Holding's capital structure. The closing date was originally set for March 31, 1999, but this was later amended to April 14, 1999.

The NFL owners scheduled a vote on WSV's proposed ownership of the Washington Redskins on April 7, 1999. Eight negative votes would prevent WSV from obtaining NFL approval, but it was aware of only three. Shortly before the NFL owners were to vote, however, WSV entered into a separate agreement with the NFL, negotiated by Commissioner Paul Tagliabue and Finance Committee Chairman Robert Kraft. According to this separate agreement, the NFL owners agreed to pay WSV the amount of any loss (up to $30 million) that it actually incurred with respect to the irrevocable letter of credit provided to JKC Holding under the Agreement, if WSV would voluntarily withdraw its bid and agree not to sue the NFL over its application and subsequent withdrawal. The NFL owners then voted to accept

---

[1]Section 9.1 of the Agreement provides that "This Agreement may be terminated and the Stock Purchase may be abandoned at any time prior to the Closing Date: (a) by mutual written consent of Seller and Acquiror; (b) by either Seller or Acquiror, if (i) the Stock Purchase shall not have been consummated by 5:00 p.m. Eastern Time on the Termination Date; *provided*, *however*, that the right to terminate this Agreement pursuant to Section 9(b)(i) shall not be available to any party whose failure to fulfil any covenant or obligation under this Agreement has been the cause of, or result in, the failure of the Closing to occur on or before such date; . . . or (e) by Seller of Acquiror, if they are notified in writing by the Commissioner that the NFL considered and voted upon the Stock Purchase (and the other Transactions, if any, requiring NFL Approval) at a meeting held in accordance with NFL Rules and that the NFL did not approve of the Stock purchase (or any other such Transactions)." Agreement, Art. IX. (emphasis in original).

WSV's voluntary withdrawal from the approval process, and resolved to approve the agreement with WSV on condition that a satisfactory and enforceable final agreement be prepared encompassing such terms.

Following the withdrawal of WSV's bid, Cooke renewed his bid for the Redskins, but the Special Committee again rejected it and, in July 1999, sold the team to a group headed by Snyder, the Milsteins' former minority partner, for $800 million.[2]

Pursuant to its agreement with WSV, JKC Holding demanded payment under the $30 million irrevocable letter of credit on January 5, 2000. It filed a declaratory judgment action against WSV to establish its right to exercise the letter of credit, contending that all of the requirements for a Deposit Forfeiture Event had occurred. WSV counterclaimed against JKC Holding, WFI Group, Incorporated (formerly JKC, Inc.), the Estate of Jack Kent Cooke, and three individuals who were executors of the Estate, managers of JKC Holding and formerly directors of JKC, Inc. [collectively "counterclaim defendants"]. It did not sue Cooke in this action, although the record indicates that WSV has filed a separate action against him elsewhere.

WSV alleged that the counterclaim defendants breached the Agreement by failing to use their best efforts to cause the Estate, and specifically Cooke, to support its proposed deal to purchase the Redskins, and that they fraudulently induced WSV to enter into the Agreement by representing that Cooke would not interfere in the approval process. In its appeal, WSV has not challenged the district court's earlier dismissal of its breach of fiduciary duty, business conspiracy, and tortious interference with business relations claims.

On October 26, 2000, the district court granted JKC Holding's motion for summary judgment on its declaratory judgment count and dismissed WSV's remaining counterclaims. The district court found that WSV's withdrawal from the NFL approval process amounted to a repudiation of the Agreement and that WSV could not complain, and no jury could find, that JKC Holding prevented WSV from gain-

---

[2]As part of the sale, JKC Holding reimbursed Daniel Snyder his $10 million share of the irrevocable letter of credit.

ing NFL approval when it was WSV that prevented a vote from being taken by withdrawing its application.

On appeal, WSV contends that the $30 million irrevocable letter of credit agreed to by the parties is unenforceable as an illegal penalty under New York law,[3] and that JKC Holding caused WSV to withdraw its application before the NFL approval process was completed. WSV further argues that the district court erred in limiting the damages it could recover under the Agreement, and in granting summary judgment on its fraudulent inducement claim.

## II.

We review a grant of summary judgment de novo. *Virtual Works, Inc. v. Volkswagen Of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ. P. 56(c). The existence of an alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment, unless the disputed fact is one that might affect the outcome of the litigation. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). Mere speculation by the non-movant cannot create a genuine issue of material fact. *Cox v. County of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001). A material fact is one where its existence or non-existence could result in a different jury verdict. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). However, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. National Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).

---

[3]The Agreement provides that it would be governed by and construed in accordance with the laws of New York, without regard to any applicable principles of conflicts of law. Art. X, § 10.10.

The function of the judge at the summary judgment stage is not to determine the truth of a matter or to weigh credibility but to determine whether there is any genuine issue of fact that can only properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party. *Anderson*, 477 U.S. at 250. WSV and JKC Holding waived their respective rights to a jury trial under the terms of the Agreement,[4] and we are cognizant that discovery had closed and the district court was provided with thousands of pages of deposition transcripts and documents as part of the cross-motions for summary judgment. Consequently, although we still review the grant of summary judgment de novo, as a practical matter, we recognize that summary judgment may be particularly appropriate given the circumstances, because it is favored as a mechanism to secure the just, speedy and inexpensive determination of a case, where its proper use can avoid the cost of a trial. *See Thompson Everett*, 57 F.3d at 1322-23 (quoting Fed.R.Civ.P. 1). "One of the principle purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

III.

We first consider whether JKC Holding breached the Agreement by failing to meet its contractual obligation to use its best efforts to secure NFL approval for WSV. Under the terms of the Agreement, JKC Holding is entitled to exercise the letter of credit unless it breached the Agreement and such breach was the cause of WSV's failure to gain NFL approval.

Because we consider the facts in the light most favorable to the non-movant, we must assume that Cooke acted improperly following the announcement that the Special Committee had accepted WSV's bid. Even assuming that Cooke expressed his disappointment that his bid had been rejected and refused to support WSV's bid publicly, the evidence does not support a finding either that JKC Holding, and the other counterclaim defendants, violated the Agreement by failing to take disciplinary action against Cooke, or that Cooke's actions influ-

---

[4]Art. X, §10.12.

enced the NFL owners so that it would have been futile for WSV to proceed with the approval process.

Before WSV can prevail on its breach of contract counterclaim, it must establish that its alleged damages would not have occurred but for the alleged wrongful acts or omissions of the counterclaim defendants. *See Krofft Entertainment, Inc. v. CBS Songs, A Div. of CBS, Inc.*, 653 F.Supp. 1530, 1534 (S.D.N.Y. 1987). Damages are limited to those losses and pecuniary disappointments that are "caused by" the breach. *Id.* (quoting *Corbin on Contracts* (1964)). "New York contract law adheres to the rule that there can be no recovery where the plaintiff fails to prove that his injury was caused by the defendant's breach." *Id.*

JKC Holding could not and did not guarantee that Cooke would publicly support the sale of the Redskins to an entity outside of the Cooke family. Proposed language in the Agreement that would have committed JKC Holding to using its best efforts to cause its "direct and indirect owners" to use their best efforts to get NFL approval was replaced with language committing it, instead, to using its best efforts to cause the "Companies and the Estate" to so act. Moreover, WSV's representatives knew Cooke was popular with the NFL owners but chose to proceed with the Agreement, notwithstanding Cooke's disappointment at losing the Redskins, and despite being aware that this could affect WSV's ability to secure NFL approval.

The Special Committee discussed removing Cooke as an officer and director but, with WSV's assent, concluded that such a move would be detrimental to the NFL approval process. Furthermore, the Special Committee actively sought to persuade Cooke to support the proposed sale because it was in all of their best interests to secure the highest possible price for the team. Therefore, even viewing the evidence in the light most favorable to WSV, we conclude that the counterclaim defendants met their contractual "best efforts" obligations and, consequently, did not breach the Agreement.

We also affirm the district court's finding that it was WSV who breached the Agreement by voluntarily withdrawing from the NFL approval process. WSV contends that proceeding with the approval process would have been futile because of an alleged conspiracy

between Cooke and other NFL team owners to reject Milstein, WSV's controlling partner, as an owner. There is simply insufficient evidence from which the trier of fact could reasonably find for WSV on this issue. Not only can WSV not establish how the NFL owners would have voted had they been given the opportunity to do so, but it also cannot show that the counterclaim defendants' actions were the proximate cause of the owners' concerns about Milstein and WSV.

Those NFL owners who were deposed testified that Cooke was "irrelevant" and a "non-factor" in the approval process, and they refused to concede that proceeding to a vote would have been futile. Rather, the evidence establishes that the owners had grave reservations both about the illiquidity of WSV's financing and also Milstein's character. Specifically, they were concerned about: (1) the highly-leveraged nature of the proposed financing transaction and the unprecedented high level of debt involved; (2) the relatively illiquid family real estate partnerships comprising a large part of Milstein's wealth; (3) Milstein's authority (or lack thereof) to sell family assets and holdings; (4) the non-responsive and misleading responses Milstein gave to NFL inquiries into his finances; (5) Milstein's record of litigiousness and his questionable conduct in prior litigation; (6) his perceived mismanagement of the New York Islanders; (7) his treatment of his minority partners when bidding on the Cleveland Browns; (8) WSV's political public relations lobbying campaign; and (9) the possibility that Milstein would seek to reverse important NFL policies on licensing and revenue-sharing.

WSV's contention that Cooke somehow sabotaged the approval process or conspired with other NFL owners to secure his purchase of the team is belied by the ultimate sale of the team to Snyder, Milstein's former partner at WSV. That sale strongly suggests that the difficulties WSV encountered in seeking NFL approval stemmed from concerns about Milstein himself and were not caused by Cooke or the counterclaim defendants.

No reasonable finder of fact could infer from the evidence presented either that proceeding with the approval process would have been futile or that the owners' misgivings about Milstein's qualifications to be an NFL owner were proximately caused by or linked to the counterclaim defendants. WSV's failure to secure NFL approval

was not the result of any wrongdoing on the part of the seller. On the contrary, its decision to withdraw voluntarily from the process and enter into a separate deal with the NFL appears to have been motivated by a desire to protect itself from the anticipated loss of its $30 million irrevocable letter of credit.[5]

IV.

WSV next argues that if JKC Holding is entitled to exercise the $30 million letter of credit pursuant to the terms of the Agreement, the deposit constitutes an unenforceable penalty under New York law and should be struck from the Agreement. WSV correctly notes that the district court misapplied the legal test, under New York law, for considering the validity of the provision. However, the $30 million deposit passes muster even under the proper two-prong inquiry set forth in *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 361 N.E.2d 1015 (N.Y. 1977):

> The rule is now well-established. A contractual provision fixing damages in the event of a breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation. If, however, the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced.

*Id*. at 1018.

In interpreting a provision fixing damages, it is immaterial what the parties choose to call the provision. *Id*. Furthermore, "the agreement should be interpreted as of the date of its making and not as of the date of its breach." *Id*. at 1019. *See generally X.L.O. Concrete Corp. v. John T. Brady & Co.*, 482 N.Y.S.2d 476, 478-79 (App. Div. 1984) (summarizing the principles by which liquidated damages clauses are evaluated). New York law permits the use of liquidated damages

---

[5]In light of our ruling that JKC Holding did not breach the contract, we need not consider WSV's claim that the district court erred in holding that it was precluded from recovering damages other than its out-of-pocket expenditures in the event of a breach under the Agreement.

clauses in contracts and provides that the validity of such clauses is a question of law to be determined by the court. *Brecher v. Laikin*, 430 F.Supp. 103, 106 (S.D.N.Y. 1977) (citing *Mosler Safe Co. v. Maiden Lane Safe Deposit Co.*, 93 N.E. 81 (N.Y. 1910)).

The district court correctly concluded that the $30 million irrevocable letter of credit provided to JKC Holding by WSV on January 13, 1999 bore a reasonable proportion to the probable loss. This amount represents only 3.75% of the total purchase price and is less than half of the $75 million difference between WSV's bid and the next highest bid. *See e.g.*, *Brazen v. Bell Atlantic Corp.*, 695 A.2d 43 (Del. 1997) (upholding reasonableness of a $550 million liquidated damages provision in merger agreement where sum represented only 2% of one corporation's market capitalization).

Furthermore, when the parties entered into their Agreement, the amount of the actual loss in the event WSV's bid to buy the Washington Redskins failed was incapable of precise estimation. Morgan Stanley, the investment bank which oversaw the controlled auction, advised the Special Committee that if the bid failed the value of the shares would likely decrease and potential buyers could lose interest, thus resulting in a lower sale price, as well as added transaction and administrative costs. The Special Committee requested the letter of credit as an incentive to insure that WSV did not suffer buyer's remorse but used its best efforts to secure NFL approval.

Liquidated damages provisions are based on the principle of just compensation and may not be used to reap a windfall or to secure performance by the compulsion of disproportion. *In re: Coastline Steel Prod., Inc.*, 402 N.Y.S.2d 947, 950 (Sup. Ct. 1978). Given the quality and quantity of lawyers working on its behalf, the sophistication of the parties and the parity of their bargaining power, WSV's claims that this provision is illegal and was imposed on them *in terrorem* is unsubstantiated by the evidence and defies commonsense.

Accordingly, JKC Holding is entitled to exercise the letter of credit because it neither breached the Agreement nor caused the NFL's failure to approve WSV within the time period provided. Furthermore, the $30 million irrevocable letter of credit is an enforceable liquidated damages provision under New York law because the damages flow-

ing from the failure of WSV's bid were difficult to ascertain at the time the parties entered into the Agreement, and the amount of damages is not plainly disproportionate to the injury.

V.

Finally, we turn to WSV's contention that the district court erred in deciding that there was no evidence upon which a reasonable factfinder could conclude that JKC Holding's representatives misrepresented material facts during the contract negotiations. Given their later testimony that they had no idea what Cooke would do at that time, WSV argues that these representatives misled it about Cooke's present state of mind when they reported they were sure he would get over his disappointment and would live up to his agreements. WSV further alleges that the seller's representatives fraudulently omitted material facts by not fully disclosing all of the information given to them by NFL staff, such as the NFL wanting to see Cooke's bid, whether or not it was selected.

"The elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2nd Cir. 1987). Each element must be established by clear and convincing evidence. *Id.* at 971. *See also Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 250 N.E.2d 214, 217 (N.Y. 1969) (listing the five elements of fraudulent misrepresentation as "a representation of fact, which is either untrue or recklessly made, and which is offered to deceive the other party and to induce them to act upon it, causing injury.").

WSV's claims fail as a matter of law because JKC Holding's representatives were merely reporting what they had been told about Cooke's reaction. Their comments were opinions and predictions of what they hoped or anticipated would happen, not statements of material fact. *See Plautus Corp. Pension Plan v. Nazareth*, 705 N.Y.S.2d 649, 650 (App. Div. 2000) ("The rule is that a representation of opinion or a prediction of something which is hoped or expected to occur in the future will not sustain an action for fraud."); *Chase Inv., Ltd. v. Kent*, 681 N.Y.S.2d 319, 320 (App. Div. 1998) (same). Moreover, WSV was given the opportunity to walk away from the proposed deal

in light of the information. Instead, it chose to proceed and thereby assumed the risk of the "Cooke" factor. WSV's own representatives testified that they were aware that Cooke's opposition to the deal could make it harder for WSV to secure NFL approval. A knowing misrepresentation is a fundamental and essential element of a cause of action for fraud, *Marine Midland Bank v. John E. Russo Produce Co.*, 405 N.E.2d 205 (N.Y. 1980), and there was no such knowing misrepresentation here.

WSV's fraud by omission claim also fails under New York law, which recognizes that a party to a business deal has a duty to speak in only the following three situations:

> [F]irst, where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth; second, when the parties stand in a fiduciary or confidential relationship with each other; and third, where one party possesses superior knowledge not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.

*Brass v. American Films Tech. Inc.*, 987 F.2d 142, 150 (2nd Cir. 1993) (internal citations omitted). None of these situations exists here. The parties were not in a confidential or fiduciary relationship. JKC Holding disputes that it had superior knowledge. However, even assuming that it did, there is no evidence either that WSV would not have entered into the Agreement had it known that the NFL wished to see Cooke's bid, or that JKC Holding was aware that WSV was acting on the basis of mistaken knowledge.

Milstein had previously bid on the Cleveland Browns and was familiar with the process of bidding on and purchasing professional sports teams. One of his representatives in the final negotiations with JKC Holding was David Seldin, the former president of the Jacksonville Jaguars. Seldin testified that he was aware of the impact that Cooke would have on the NFL approval process and that the deal could fail if he opposed it. Consequently, we affirm the district court's ruling because WSV has failed to raise a triable issue of fact as to whether there was fraud in the inducement.

## VI.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.