UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SUBURBAN MORTGAGE ASSOCIATES,
INCORPORATED,

   *Plaintiff-Appellant,*

v.

MERRILL LYNCH MORTGAGE CAPITAL,
INCORPORATED,

   *Defendant-Appellee.*

No. 01-2440

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Deborah K. Chasanow, District Judge.
(CA-96-1718-DKC)

Argued: September 23, 2002

Decided: November 14, 2002

Before WILKINSON, Chief Judge, TRAXLER, Circuit Judge,
and Claude M. HILTON, Chief United States District Judge
for the Eastern District of Virginia, sitting by designation.

Affirmed by unpublished opinion. Chief Judge Hilton wrote the opinion in which Chief Judge Wilkinson and Judge Traxler joined.

## COUNSEL

**ARGUED:** Vincente L. Martinez, PATTON BOGGS, L.L.P., Washington, D.C., for Appellant. Warren H. Colodner, KIRKPATRICK & LOCKHART, L.L.P., New York, New York, for Appellee. **ON**

**BRIEF:** Timothy A. Vanderver, Jr., PATTON BOGGS, L.L.P., Washington, D.C., for Appellant. Loren Schechter, KIRKPATRICK & LOCKHART, L.L.P., New York, New York; Charles R. Mills, KIRKPATRICK & LOCKHART, L.L.P., Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

HILTON, Chief District Judge:

This matter comes before the Court on appeal by Suburban Mortgage Associates, Inc. ("Suburban") to the district court's decision to grant summary judgment for Merrill Lynch Mortgage Capital, Inc. ("Merrill Lynch") on claims of fraud, negligent misrepresentation, and breach of contract.

In 1993, Suburban entered into an exclusive conduit relationship with PaineWebber.[1] The agreement required Suburban to give PaineWebber a right of first refusal on all conduit loans originated by Suburban. This relationship continued from 1993 to early 1994. In early 1994, Suburban began looking for another conduit partner in order to expand into commercial lending and because it was dissatisfied with PaineWebber.

In March 1994, Suburban approached Merrill Lynch to form a new mortgage conduit partnership; an initial meeting was arranged for early May 1994 in San Francisco. At this meeting Suburban claims that it disclosed the identities of its largest borrowers, William Friedman[2] and John Doyle, and discussed their loan portfolios, to ensure

---

[1]A conduit relationship is one in which a lender originates and sells loans to a secondary purchaser. The secondary purchaser packages the loans as collateral for its mortgage-backed securities.

[2]Mr. Friedman had been the target of negative publicity and allegations arising from his business dealings in the 1980s for Southmark, a real estate company involved in a large number of failed loan transactions.

that Merrill Lynch was comfortable working with them. Suburban also claims it disclosed the fact that its Executive Vice President, Patrick Nolan, was formerly associated with DRG Financial, Inc.[3] Merrill Lynch contends that none of these names were mentioned at the meeting.

Suburban claims that these disclosures did not deter Merrill Lynch from forming a business relationship, and that Merrill Lynch stated that Friedman's business would not be a problem. Suburban contends Merrill Lynch was eager to receive as much business as possible from Suburban, and that because Merrill Lynch had just entered the conduit business Suburban's experience and expertise were assets.

Suburban and Merrill Lynch met again in New York on May 25, 1994, to further discuss the conduit partnership. Suburban claims that it again discussed the nature of its business and the identity of its key borrowers, and that Merrill Lynch was enthusiastic about working with Suburban. Merrill Lynch claims that Suburban expressed frustration with PaineWebber, and that the parties simply agreed to discuss the matter again.

During June 1994, Suburban and Merrill Lynch held two meetings in Bethesda, Maryland, where they discussed underwriting and loan processing issues. The parties exchanged forms used in preparing loan packages, as well as a draft of an agreement pursuant to which Suburban would originate mortgage loans. Later in June 1994, the parties met in New York to review specific loans; Suburban claims that it again discussed its borrowers, including Friedman. On June 21, 1994, Merrill Lynch sent Suburban a draft letter of intent. Suburban states that the two had an informal agreement that they would work together as partners.

Meanwhile, Suburban began to withdraw from its relationship with PaineWebber, which it claims was at Merrill Lynch's request. In early June 1994, Suburban notified PaineWebber of its desire to withdraw from the conduit, and gave formal notice on June 28, 1994. Merrill Lynch states that Suburban withdrew from the PaineWebber agree-

---

[3]In the late 1980s, DRG Funding was accused of improprieties by the Department of Housing and Urban Development.

ment because PaineWebber had ceased processing Suburban's loans. On July 6, 1994, PaineWebber agreed to consent to the withdrawal.

Also on July 6, 1994, Merrill Lynch issued commitments to purchase loans for three properties from Suburban: Prado Bay, Southern Elms, and Oakland Square. Two of these loans were made to borrowers affiliated with Friedman. Merrill Lynch claims that Suburban never disclosed Friedman's involvement, and that the commitments were conditioned upon all information being satisfactory. Upon discovering the connection to Friedman, Merrill Lynch revoked its purchase commitments for two loans associated with him on July 16, 1994, and Suburban claims that Merrill Lynch demanded that it sever ties with Friedman if it wanted to continue the business partnership. Merrill Lynch claims that it merely told Suburban it would not purchase any Friedman loans, based on both firsthand knowledge of Friedman's misconduct as well as his reputation for wrongdoing in the real estate industry.

Suburban asked whether the ban on Friedman included Doyle, representing to Merrill Lynch that the relationship between the two men was indirect. Merrill Lynch stated that it would first have to investigate the Friedman-Doyle business relationship. Pursuant to this conversation, Nolan drafted a memorandum to Merrill Lynch, which stated that the only connection between Doyle and Friedman was indirect in that Doyle was a principal shareholder and president of an advisory company connected to Friedman; this memorandum was intended to aid Merrill Lynch in making its decision. Merrill Lynch conducted a subsequent investigation which revealed that Doyle and Friedman were closely related business partners, and that the properties Suburban sought Merrill Lynch to refinance were co-owned by Doyle and Friedman. Despite Merrill Lynch's refusal to work with Doyle, Suburban continued to work on Doyle properties until November 1994.

Subsequent investigations by Merrill Lynch also revealed that both Nolan and Suburban had close relationships with Friedman. Moreover, when Merrill Lynch contacted PaineWebber about Suburban, PaineWebber accused Suburban, Nolan, and Friedman of engaging in improper conduct.

Suburban claims that Merrill Lynch assured it on multiple occasions that as long as it discontinued business with Friedman, the conduit partnership would continue. On August 15, 1994, Suburban signed a formal Correspondent Agreement and a Mortgage Loan Purchase Agreement; the Correspondent Agreement expressly provided that the contract was terminable at will without cause at any time by either party. Suburban claims that from August through October 1994, it was in daily contact with Merrill Lynch and spent great time and effort drafting underwriting and closing documents for their conduit partnership.

In early November 1994, Suburban closed its first loan for the Merrill Lynch conduit. On November 14, 1994, Merrill Lynch told Suburban by phone that it had decided to terminate the Correspondent Agreement based on its failure to disclose the relationships with Friedman, his associate Gene Phillips, and Doyle, as well as conduct by Nolan.

On May 7, 1996, Suburban brought its Original Complaint against Merrill Lynch, which alleged six counts: (I) breach of the Prado Bay Purchase Commitment, (II) breach of the Southern Elms Purchase Commitment, (III) breach of the Bloomfield Convenience Commitment, (IV) negligent misrepresentation, (V) breach of the Correspondent Agreement, and (VI) breach of the duty of good faith and fair dealing. Merrill Lynch removed the case from the Circuit Court for Montgomery County, Maryland to the United States District Court for the District of Maryland.

On July 12, 1996, Merrill Lynch moved to dismiss the Original Complaint. The district court orally dismissed Counts V and VI on October 23, 1996, and issued a written order and opinion on March 27, 1997.[4] On April 21, 1998, Merrill Lynch moved for partial summary judgment on Counts I, II, and IV of the Original Complaint, which the district court granted on February 2, 1999. Suburban moved for reconsideration, which the district court denied.

---

[4]Suburban is not appealing the dismissal of Counts V and VI of the Original Complaint.

While the district court was considering Merrill Lynch's Motion for Partial Summary Judgment, Suburban moved to amend Count V of the Complaint. The district court granted Suburban's motion on February 2, 1999, and Suburban filed an amended complaint on February 23, 1999 adding Count V for fraud.

On May 15, 2000, Merrill Lynch moved for partial summary judgment on Suburban's Count V, which the district court granted on December 28, 2000. Suburban moved for reconsideration, which the district court denied. The district court dismissed Count III on October 28, 2001 pursuant to a Stipulation of Dismissal. Suburban filed a timely Notice of Appeal on November 28, 2001.

The issues presented for appellate review are whether the district court erred by granting summary judgment for Merrill Lynch regarding Suburban's claims for fraud, negligent misrepresentation, and breach of the purchase commitments. Because Suburban's claims are without merit, we affirm.

This Court reviews the district court's grants of summary judgment *de novo*. *Providence Square Assocs. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000). A party cannot rely on mere allegations in its pleadings; rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

I.

Suburban failed to meet the heightened burden of proof that Maryland law requires to prove a fraud claim. Suburban was obligated to come forward with clear and convincing evidence demonstrating that a reasonable jury could find for Suburban as to each of the essential elements of its claim. *VF Corp. v. Wrexham Aviation Corp.*, 715 A.2d 188, 193 (Md. 1998). To prove fraud under Maryland law, Suburban was required to prove that Merrill Lynch made a false statement of material fact to Suburban; that Merrill Lynch knew the statement was false or was recklessly indifferent to its truth; that Merrill Lynch intended to defraud Suburban; that Suburban justifiably relied on the

misrepresentation; and that Suburban suffered injury resulting from the misrepresentation. *Id.* To establish fraud based on concealment, Suburban had to prove that Merrill Lynch owed a duty to disclose the fact allegedly concealed. *Green v. H&R Block, Inc.*, 735 A.2d 1039, 1059 (Md. 1999).

Suburban's evidence fails to demonstrate that Merrill Lynch made a false statement of material fact. Suburban first complains that during the first meeting in May 1994, two representatives of Merrill Lynch did not express concern about either Friedman or Doyle. In this factual context, the alleged comments can only be viewed as an expression of opinion at the time, and do not constitute statements of material fact which Suburban could rely upon. *Steigerwald v. Bradley*, 136 F. Supp. 2d 460, 470 (D. Md. 2001) (noting that a statement of opinion, estimate, or mere puffing cannot form the basis of an intentional misrepresentation claim); *Snyder v. Herbert Greenbaum Assocs.*, 380 A.2d 618, 621 22 (Md. 1977). Moreover, Suburban has failed to prove any fraudulent intent arising from a statement made at a preliminary meeting between the two parties. *See Paramount Brokers, Inc. v. Digital River, Inc.*, 126 F. Supp. 2d 939, 951 (D. Md. 2000) (finding that statements made during party negotiations were not fraudulent because they related to the future course of the business relationship). Mere enthusiasm about a potential business relationship cannot form the basis for a fraud claim.

Suburban next claims that in July 1994 Merrill Lynch misrepresented the future impact that Suburban's relationship with Friedman would have on the conduit relationship. The district court held that Merrill Lynch's alleged statements regarding Friedman in July 1994 were true at that time, since as of mid-July there was no evidence that Merrill Lynch intended to terminate the relationship with Suburban. Rather, Merrill Lynch did not decide to stop working with Suburban until after the statements were made, when Merrill Lynch had both investigated and worked closely with Suburban. These statements, which went to the parties' expectations as to the conduit relationship, cannot form the basis of a fraud claim. *See Abt Assocs. v. JHPIEGO Corp.*, 104 F. Supp. 2d 523, 537 (D. Md. 2000) (rejecting plaintiff's attempt "to prove fraud inferentially by asserting that defendant's statements concerning its expectations as to [the parties' business

relationship] were never realized and that they therefore must have constituted fraud").

Finally, Suburban alleges that after the Correspondent Agreement had been executed, Merrill Lynch assured Suburban that they were "members of the same team" and that "the conduit relationship was secure." Suburban has only pointed to one instance in October 1994 to support its argument, where it claims that a Merrill Lynch representative stated that the relationship "was going peachy," but could not cite the specific words used by Merrill Lynch. Such general comments of impression or opinion do not rise to the level of affirmative misrepresentation necessary to sustain a fraud claim as a matter of law. *See JKC Holdings*, 264 F.3d at 469 (stating that opinions and predictions of what a party might hope or anticipate will happen are not statements of material facts that can sustain an action for fraud).

Suburban next argues that Merrill Lynch concealed material facts from it, namely Merrill Lynch's failed business dealings with Friedman and its subsequent decision to investigate Suburban in late July or early August. However, because Suburban failed to prove by clear and convincing evidence that Merrill Lynch owed any duty to Suburban, the district court properly dismissed Suburban's claim for fraudulent concealment. A defendant's decision to terminate its business relationship with a plaintiff cannot form the basis of a fraudulent concealment action in the absence of a fiduciary or confidential relationship. *Cheney Bros., Inc. v. Batesville Casket Co.*, 47 F.3d 111, 114-15 (4th Cir. 1995). Moreover, there is no evidence that Merrill Lynch made any partial or fragmentary statements of fact that gave rise to a duty to disclose. Suburban was on notice that Merrill Lynch intended to conduct an investigation of both Friedman and Doyle; moreover, Suburban cannot be surprised that these inquiries inevitably led to suspicions about its own misconduct.

Finally, there is no evidence set forth that Merrill Lynch intended to deceive Suburban. Merrill Lynch's statements regarding the stability of the relationship, as well as its subsequent decision to investigate and then terminate the conduit partnership, were true opinions when stated. Because there is no evidence that Merrill Lynch acted pursuant to "dishonest, corrupt or immoral" motives, Suburban has failed to prove by clear and convincing evidence the prerequisite for fraud.

*Ellerin v. Fairfax Sav., F.S.B.*, 652 A.2d 1117, 1125 (Md. 1995). Additionally, Suburban's theory that Merrill Lynch intended to exploit and steal Suburban's conduit expertise has no support from the record.

## II.

The district court properly granted summary judgment on Suburban's negligent misrepresentation claim since Suburban failed to demonstrated that Merrill Lynch made any false statements or that it even owed a duty of care to Suburban. As demonstrated above, each of the alleged statements about which Suburban complains was either true when made or was an expression of opinion or a prediction that cannot form the basis of a claim. *Paramount Brokers*, 126 F. Supp. 2d at 951.

In addition, the district court correctly found that the negligent misrepresentation claim should be dismissed since Merrill Lynch did not owe a duty of care to Suburban. Under Maryland law, "a negligent misrepresentation action may be maintained only . . . where there is an 'intimate nexus' between the parties." *21st Century Props. Co. v. Carpenter Insulation & Coatings Co.*, 694 F. Supp. 148, 153 (D. Md. 1988) (citation omitted). At the time of the alleged misrepresentations, Merrill Lynch and Suburban were negotiating the terms of a proposed agreement. Such "arms length negotiations between representatives of business entities . . . cannot be said to be 'intimate' unless language is to be stripped of all meaning." *Id.* at 154.

Furthermore, Suburban has failed to put forth any evidence that Merrill Lynch acted negligently. Merrill Lynch did not learn about the misconduct involving Nolan and Suburban until after the Correspondent Agreement had been executed. Thus, any statement about the stability of the relationship made prior to this discovery was not made negligently, and Merrill Lynch raised numerous reasons which are adequate to terminate the relationship.

## III.

The district court properly granted Merrill Lynch summary judgment on Suburban's breach of purchase commitments claim. The lan-

guage of the purchase commitments clearly and unambiguously states that any obligation of Merrill Lynch to purchase the loans was conditioned upon all information being satisfactory. Thus, Merrill Lynch was entitled to decide that it would not purchase the loans upon finding that the properties were associated with Friedman. And, while Merrill Lynch was required to use good faith in exercising its right to revoke the commitments, *see United Wholesalers, Inc. v. A.J. Armstrong Co.*, 251 F.2d 860, 862 (4th Cir. 1958), there is no evidence on the record that Merrill Lynch did otherwise. Merrill Lynch's past experiences with Friedman, as well as his public reputation, provided substantial support for Merrill Lynch's decision to reject the purchase commitments.

*AFFIRMED*