**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 05-1514**

MICHAEL S. ALBA,

Plaintiff - Appellant,

versus

MERRILL LYNCH & CO; MERRILL LYNCH, PIERCE,
FENNER & SMITH, INCORPORATED,

Defendants - Appellees.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria. Claude M. Hilton, District
Judge. (CA-04-647-1)

Argued: February 1, 2006          Decided: May 26, 2006

Before MICHAEL, SHEDD, and DUNCAN, Circuit Judges.

Affirmed in part and vacated and remanded in part by unpublished
opinion. Judge Shedd wrote the opinion, in which Judge Michael and
Judge Duncan joined.

**ARGUED:** Merril Jay Hirsh, ROSS, DIXON & BELL, L.L.P., Washington,
D.C., for Appellant. Stephen Edward Brown, MAYNARD, COOPER & GALE,
P.C., Birmingham, Alabama, for Appellees. **ON BRIEF:** Elizabeth
Sarah Gere, Rebecca Woods, Prashant K. Khetan, ROSS, DIXON & BELL,
L.L.P., Washington, D.C., for Appellant. Carole G. Miller, Stuart
D. Roberts, MAYNARD, COOPER & GALE, P.C., Birmingham, Alabama, for
Appellees.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

SHEDD, Circuit Judge:

Michael S. Alba sued his former employer, Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith, Inc. (collectively referred to as "ML"),[1] alleging a violation of the Age Discrimination in Employment Act (the "ADEA") and breaches of various agreements. The district court granted summary judgment in favor of ML, and Alba appealed. We affirm in part and vacate and remand in part.

I.

We review de novo the grant of summary judgment. JKC Holding Co. v. Washington Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). In conducting our review, we view the evidence in the light most favorable to Alba. See Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

Alba, a retired Air Force colonel, joined ML as a financial advisor in its Northern Virginia region in 1988. At that time, he signed a document acknowledging that all records (including the names and addresses of its clients) are the property of ML and would remain the property of ML even after Alba's employment at ML ended.

---

[1]It is not clear which entity actually employed Alba. For purposes of our review, we assume that Alba was employed by both.

2

In 1993, Alba entered into an agreement with another ML financial advisor, Herbert Vogel, who was planning to retire in 1996. According to the Vogel agreement, Vogel and Alba pooled all of their client accounts under Vogel's ML financial advisor number, and the two agreed to share compensation from their joint clients. The agreement also provided that Vogel would "relinquish title to all accounts to" Alba in 1996 when Vogel retired, and Alba would thereafter "be the sole financial consultant responsible for all accounts." J.A. 267.

In the first year of this agreement, Vogel received 70% of the compensation from the joint accounts, and Alba received 30%. These percentages incrementally changed to Alba's benefit in the following years, so that by 1996, the last year of the agreement, Alba received 80% of the compensation and Vogel received 20%. This type of pooling agreement is referred to as selling a financial advisor's "book of business" to another financial advisor.

In 1992, before the Vogel agreement, Alba earned approximately $80,000. Although Alba potentially risked reducing his income by entering into the Vogel agreement, Alba's income actually increased to $107,000 in 1993, the first year of the agreement. In 1996, the last year of the Vogel agreement, Alba's annual compensation grew to approximately $338,000. After the agreement ended, Alba's compensation continued to grow at a rapid pace, and in 2000 Alba earned approximately $850,000. Alba's book of business eventually

3

grew to approximately 1,200 clients, making him one of the largest producers in ML's Northern Virginia region.

In 2000, ML opened a new office in Reston, Virginia. ML asked Alba to transfer to the Reston office so it could have a well-established top producer there. ML offered Alba the first choice of office space, and Alba agreed to the transfer.

When Alba moved to the new Reston office, he started a new team, the Alba Group, with his son Chris, another ML financial advisor. Although Alba had no plans to retire, his agreement with Chris was somewhat similar to the Vogel agreement in that he and Chris pooled their client accounts and shared compensation on an 80%/20% basis. In their agreement, the Albas acknowledged that ML "at all times retains the right to assign customer accounts to the Financial Advisors which it believes will best service those customers." J.A. 259. They also agreed not to solicit any account or customer within a specified area upon termination of their employment. The agreement also provided that members of the team are "employees at will of [ML] who can quit [ML] or whom [ML] can discharge at any time with or without cause." J.A. 260.

The stock market performed poorly in 2000 through 2002. By the spring of 2001, a few of Alba's clients complained that Alba was mishandling their accounts. In April 2001, Andrew Greene, Alba's immediate supervisor, reviewed Alba's accounts and determined that Alba had an overly aggressive, non-diversified

4

investment strategy for many of his older clients. Greene also thought that there was too much margin trading in Alba's client accounts. Greene directed Alba to utilize a more conservative investment strategy and to reduce the level of margin trading in his client accounts. Other superiors also met with Alba and advised him to diversify his client accounts and reduce margin holdings to 5% of account balances.

By May 2002, the number of clients who had made complaints against Alba had grown to more than ten. Most of these clients were nearing or over 60 years old. The ML compliance officer reviewed Alba's client records and determined that Alba had not reduced margin in his client accounts. Fifty-four of Alba's clients -- out of approximately 1,200 -- had margin balances of over 50%, and twenty-three of these accounts were held by clients over 60 years old.

By the end of May 2002, Peter DiCenso, the director of ML's Northern Virginia region, decided to fire Alba based on his poor performance. DiCenso believed, however, that Alba might be able to receive approximately $400,000 from two separate benefit plans maintained by ML -- the Financial Advisor Capital Accumulation Award Plan (the "FACAAP") and the WealthBuilder Account Plan (collectively "the Plans") -- if Alba agreed to retire. DiCenso directed Greene to urge Alba to retire.

On June 11, Greene had lunch with Alba and pressed him about a recent complaint that had been made against Alba. Greene said that it was time for Alba to retire so that he and his wife could enjoy their "golden years." J.A. 746. Greene also asked Alba, who was then 62 years old, "[h]ow old are you anyway." Id. Greene assured Alba that he would be able to get all of his FACAAP and WealthBuilder benefits if Alba agreed to retire, but Greene said that Alba would not be allowed to sell his book of business. Despite being pressured by Greene, Alba refused to retire.

Soon thereafter, DiCenso confronted Alba and his son Chris with purported evidence of the Alba Group's mishandling of several of its client accounts. Some of the client accounts listed by DiCenso, however, did not belong to the Alba Group. DiCenso proposed to Alba that he retire so he could possibly get his FACAAP and WealthBuilder benefits. To stress how dire Alba's situation was, DiCenso told Alba that he was in an "irreversible" position and that the highest level officials at ML would probably terminate Alba. J.A. 901. DiCenso also told Chris that he should resign and that, if Chris refused to resign, he would be fired for cause and ML would make it difficult for Chris to get a financial advisor position with another firm. Soon after this meeting, Chris resigned, and ML fired another young trainee in the Alba Group. Alba lost approximately $120,000 he would have earned for mentoring

the trainee had ML allowed the trainee to complete the training program.

A few days later, on June 21, ML disconnected Alba's access to ML's computer system. DiCenso telephoned Alba three times that day, inquiring whether Alba had decided to retire. In the first conversation, Alba said that he needed more time to decide. DiCenso told Alba that he could have until 6:00 p.m. that day. DiCenso also warned Alba that he would lose his $400,000 "football" of benefits under the FACAAP and WealthBuilder Plan if he refused to retire. DiCenso made the second call shortly before 6:00 p.m. Alba insisted that he did not want to leave ML. DiCenso replied that Alba had just lost $400,000 by refusing to retire. Less than a minute later, however, DiCenso called back and told Alba to forget about their last conversation and that "we'll work something out next week." J.A. 750. This last phone conversation lasted about one minute.

Instead of waiting to discuss the matter further the following week, Alba sent a letter of resignation to DiCenso the next day, stating: "It is obvious that ML has intended to force my resignation. The various actions taken against me, those who work for me and my family have made my working conditions so intolerable that no reasonable person could expect to work." J.A. 106.

In his deposition in this case, Alba was questioned regarding whether he had "the sense that if you did not resign from [ML] that

7

you would have been terminated?" Alba replied: "I can't make that conclusion . . . because Mr. DiCenso in that 60-second phone call after the second phone call, said . . . '[w]e'll talk about this next week. We can maybe make an arrangement'" J.A. 196. Although Alba doubted DiCenso's sincerity, he believed that it was possible that ML would work out some arrangement without terminating his employment.

After Alba resigned, ML refused to pay Alba more than $450,000 in Alba's FACAAP and WealthBuilder Plan accounts. ML also did not allow Alba to sell his book of business. Instead, ML distributed all of Alba's accounts to other ML financial advisors.

## II.

In his original complaint, Alba asserted that ML violated the ADEA by constructively discharging him (Count I); that ML breached the Vogel agreement and/or an implied agreement by disallowing him from selling his vested interest in his book of business (Counts II and III); that ML breached its agreement to pay, or should be equitably estopped from denying him, benefits under the FACAAP and WealthBuilder Plan (Count IV); that ML should be promissorily estopped from depriving him of his vested interest in his book of business (Count V); that ML fraudulently induced him to enter the Vogel agreement while ultimately planning to seize his book of business by forcing him to resign without compensating him (Count

8

VI); that ML was unjustly enriched by seizing his book of business without compensating him (Count VII); that ML converted his book of business by seizing it without compensating him (Count VIII); that ML defamed him by making false representations about his professional reputation (Count IX); that ML intentionally interfered with his expectancy that he would continue to have a business relationship with his clients (Count X); and that ML intentionally inflicted emotional distress on him by seizing his book of business and constructively discharging him (Count XI).

Alba agreed to the dismissal of Count V (Promissory Estoppel), Count VI (Fraudulent Misrepresentation), and Count IX (Defamation). The district court granted ML's motion to dismiss Count VIII (Conversion), Count X (Interference with Business Opportunity), and Count XI (Intentional Infliction of Emotional Distress). Alba does not appeal the dismissal of these six claims.[2]

After extensive discovery, ML moved for summary judgment. Soon thereafter, Alba sustained serious injuries in a fall and was hospitalized. Alba's counsel moved to continue trial and to allow Alba additional time to file an affidavit explaining some of his statements in his deposition. In particular, Alba wanted to clarify that he knew that ML was trying to force him out when he

---

[2]After the district court dismissed Alba's original claim alleging intentional interference with a business opportunity, Alba amended that count. The district court later granted summary judgment in favor of ML on that count, and Alba does not appeal that ruling.

resigned. The district court granted the motion to continue trial but denied Alba's request to file an additional affidavit, concluding that Alba was not seeking to add new evidence but rather was merely attempting to argue inferences from evidence already in the record.

The district court thereafter granted summary judgment in favor of ML on all of Alba's remaining claims. Within ten days, Alba filed a motion to alter or amend the judgment, and attached an affidavit making several new allegations and explaining his previous deposition testimony. ML moved to strike this new affidavit.

The district court denied Alba's motion to alter or amend the judgment, and Alba timely filed a notice of appeal. Four days after Alba filed his notice of appeal, the district court granted ML's motion to strike the new affidavit as "untimely filed." J.A. 1964. Alba filed an amended notice of appeal to include the district court's order striking the new affidavit.

III.

A.

Alba argues that the district court erred by granting summary judgment in favor of ML on his claim that ML constructively discharged him based on his age.[3]  We disagree.

Under the ADEA, it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  To establish a prima facie case of age discrimination by constructive discharge under the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), framework, Alba must establish the

---

[3]Although Alba alleged only constructive discharge in his complaint, we will also consider his additional claim advanced on appeal that he was actually discharged.

Alba's actual discharge claim lacks merit.  While it is true that the words "fired" or "terminated" need not be used by an employer before an employee may deem himself actually discharged, Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004), a plaintiff may not resign and later claim he was actually discharged if he did not think at the time of his resignation that his termination was inevitable, see EEOC v. Service News Co., 898 F.2d 958, 960-62 (4th Cir. 1990)(ruling that sufficient evidence supported finding of actual discharge in part because the plaintiff concluded that she was being discharged based on her last conversation with her supervisor).  Alba stated in his deposition that after his final conversation with DiCenso he thought that it was possible that his employment at ML would not be terminated. Thus, it is clear that Alba did not consider his employment actually terminated when he resigned.  Alba's complaint confirms Alba's perception that his was a constructive rather than actual termination.  Alba alleges that he "submitted to [ML] a letter recognizing his constructive discharge." J.A. 76 (emphasis added).

11

following four elements: (1) he was constructively discharged; (2) he was at least 40 years old at that time; (3) he was performing his job duties at a level that met ML's legitimate expectations at the time of his constructive discharge; and (4) he was treated more harshly than other similarly situated younger employees. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)(en banc); Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993) (establishing elements of prima facie case in enforcement of disciplinary measures in race discrimination context). It is undisputed that Alba satisfies the second element because he was 62 years old when his employment terminated. We also conclude that a question of fact exists whether Alba was meeting his employer's legitimate job expectations when his employment terminated. We hold, however, that Alba has failed to establish that he was constructively discharged and that he was treated more harshly than similarly situated younger employees.

### 1.

Alba has failed to present evidence demonstrating that he was constructively discharged. An employee who is not actually discharged may be entitled to relief, if his employer intentionally makes his working conditions intolerable in an effort to cause him to resign. Honor, 383 F.3d at 186. Because constructive discharge claims are susceptible to abuse by those who voluntarily leave their employment, we have insisted that they be strictly cabined.

12

Id. at 187.  To demonstrate constructive discharge, an employee must prove (1) that the employer's intentional actions were motivated by age bias and (2) that the working conditions were objectively intolerable.  Id. at 186-87.

Assuming without deciding that Alba has sufficiently established that ML's efforts to force his resignation were motivated specifically by age bias, Alba must demonstrate that his working conditions were so objectively intolerable that a reasonable employee would have been compelled to quit.  See Pennsylvania State Police v. Suders, 542 U.S. 129, 141 (2004). Alba claims his working conditions were intolerable because his supervisors, all of whom were much younger, unfairly criticized his work.  Although Alba concedes that a minute percentage of his clients complained about how he was handling their accounts, he insists that his trading practices were not as risky as the practices of other younger financial advisors, including his immediate supervisor.  Alba also asserts that his supervisors tried to make his working conditions intolerable by forcing his son to resign and firing another trainee in the Alba Group at that same time ML was trying to force him out, by threatening him with loss of his FACAAP and WealthBuilder benefits if he refused to retire, by telling some of his colleagues that his employment would be terminated long before he ultimately left, and by disconnecting his access to ML's computer system.

13

While we agree that Alba's allegations show that his working conditions were difficult and stressful, we hold that they cannot reasonably be described as intolerable.  See Honor, 383 F.3d at 183-87 (concluding that plaintiff's job conditions were not intolerable even though he was told that he would be losing his job and was subjected to racial hostility from a coworker); Williams v. Giant Food Inc., 370 F.3d 423, 434 (4th Cir. 2004) (ruling that allegations were insufficient to support charge of constructive discharge even though supervisors yelled at plaintiff, gave her poor evaluations, told her she was an incompetent manager, criticized her in front of customers, and once insisted that she work with an injury).  Although Alba insists that his supervisors' complaints against him were unwarranted, "a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994).  Moreover, despite the pressure that Alba was under to retire, he admitted in his deposition that after his last conversation with DiCenso the day before he resigned he still thought it was possible that ML might work out some arrangement with him short of termination. Alba also agreed that there was nothing preventing him from returning to work the following work day and performing his duties as a financial advisor.

14

Alba has also failed to demonstrate that younger employees similarly situated to him were treated more favorably. The person most similarly situated to Alba was his son, Chris. Chris was part of the Alba Group, and ML accused both Alba and Chris of the same type of malfeasance relating to their shared client accounts. Chris was forced to resign at about the same time that his father resigned, so it is clear that ML did not treat Chris more favorably even though he was much younger.

Alba, nevertheless, argues that ML's treatment of Peter Russo, a 32 year old financial advisor, demonstrates that ML treated younger employees more favorably. Alba claims that Russo received slightly fewer client complaints than he did, but that Russo had a much smaller client base and that some of the complaints against Russo involved substantially greater investment losses than the complaints against him. Alba contends that Russo, despite receiving a much higher percentage of, and more serious, complaints than Alba, was treated more favorably because he was merely placed on probation and not forced out of his job.

In determining whether Alba has presented evidence that ML treated him less favorably than other younger employees, we must compare the treatment he received with the treatment received by persons outside his protected class for similar conduct. See Cook, 988 F.2d at 511. In other words, Alba must show that Russo engaged

in similar conduct and that ML treated Russo less harshly than Alba.

Although we assume without deciding that Russo engaged in conduct comparable in seriousness to Alba,[4] we conclude that Alba has failed to demonstrate that ML treated Russo less harshly under the circumstances. Soon after the initial complaints were lodged against Russo, ML disciplined him by prohibiting him from managing any of his group's existing investment accounts and by restricting him solely to prospecting for new clients. Because Russo had been trading excessively in his personal account, ML also transferred his personal account to another financial advisor to manage. ML received no further complaints against Russo for work performed after he was relieved of his account management duties.

By contrast, ML took no immediate tangible action against Alba when ML received the initial client complaints against him. Instead, ML directed Alba to reduce margin trading in his client accounts and to utilize a more conservative investment strategy. It was more than a year later -- after Alba received several more client complaints and after ML discovered that margin balances were

---

[4]Whether there is evidence that Russo's and Alba's conduct should be considered comparable is a close question. Although one of the primary complaints against both Russo and Alba is that they placed their clients in risky, high-tech stocks, it appears that there were other important differences in the complaints against them. For instance, Alba was accused of unauthorized margin trading but Russo was not. Moreover, most of the clients who made complaints against Alba were older and less risk-tolerant than the younger and more risk-tolerant clients that Russo advised.

16

still very high in many of Alba's client accounts -- that ML urged Alba to retire.  Moreover, even though Alba made more trades in his personal account than Russo, Alba was allowed to continue managing his personal account.  In light of the fact that ML immediately disciplined Russo but gave Alba an opportunity for more than a year to improve his client accounts, we conclude that Alba has failed to demonstrate that ML treated him more harshly than Russo.[5]

In sum, Alba has failed to establish that he was constructively discharged and that he was treated more harshly than similarly situated younger employees.  Thus, we conclude that the district court properly granted summary judgment in favor of ML on Alba's ADEA claim.

B.

Alba next argues that the district court erred by granting summary judgment on his claims alleging that ML violated his right

---

[5]An alternative basis exists for our ruling that Alba has failed to establish that he was treated more harshly than younger employees.  ML produced evidence that it discharged two other younger employees -- in addition to Chris Alba -- who received fewer complaints than Alba.  Thus, even if Alba could show that he was treated more harshly than Russo, it is clear that the record as a whole does not give rise to a reasonable inference that Alba was discriminated against because of his age.  See Cook, 988 F.2d at 512 ("A plaintiff seeking to establish a prima facie case by relying on a broad history of disciplinary enforcement cannot fairly claim that an inference of . . . discrimination should be drawn from one factual circumstance taken out of the context of the disciplinary treatment generally afforded by the employer for conduct similar to that of the plaintiff").

to be compensated for selling his book of business to other ML financial advisors. Alba contends he has presented sufficient evidence to support a claim for breach of express contract, implied contract, and unjust enrichment. We disagree.

In support of his express contract claim, Alba relies on a provision in the 1993 Vogel agreement that states: "As of January 1st 1996, or there about, Herb Vogel will relinquish <u>title</u> to all accounts to Mike Alba and Mike will be the sole financial consultant responsible for all accounts." J.A. 267 (emphasis added). Alba claims that this provision gave him a legal interest in all the accounts that were transferred to him in 1996 and a right to be compensated for transferring his book of business to other financial advisors at ML.

In the alternative, Alba claims that he had an implied contractual right to be compensated for transferring his book of business. This implied right, he contends, is based on the fact that pooling agreements like the Vogel agreement are a common mechanism at ML by which retiring financial advisors receive compensation for transferring their book of business. According to Alba, it was understood and expected that each financial advisor could sell his book of business. Alba's unjust enrichment claim is also based on the premise that ML knew that Alba expected that he would be compensated when he later transferred his accounts to another ML financial advisor.

18

All of Alba's alternative claims suffer from the same fatal flaw. Even assuming that the 1993 Vogel agreement or some other implied agreement granted Alba title to his accounts and some sort of right to later transfer them for compensation, Alba relinquished any such right when he entered into the Alba Team Agreement. In that agreement, Alba specifically agreed that ML "at all times retains the right to assign customer accounts to the Financial Advisors which it believes will best service those customers" and that ML could "discharge [Alba] at any time with or without cause." J.A. 259-60. The only evidence of any agreed practice of allowing one financial advisor to sell his book of business to another financial advisor occurred during a transition period in which both the "selling" and the "buying" financial advisors agreed to share compensation from joint clients while both financial advisors remained employed by ML. Alba has pointed to no evidence that any "selling" financial advisor was paid any compensation for his book of business after his employment terminated.[6] Because Alba's employment terminated, Alba was not entitled to any additional compensation for any of the client accounts he formerly held, and ML expressly had the right under the Alba Team Agreement to reassign those accounts.

---

[6]Alba stated that he expected to be allowed to enter into an arrangement similar to the Vogel Agreement "to transition business before leaving [ML]." J.A. 1918 (emphasis added).

19

Alba also argues that ML breached the FACAAP and WealthBuilder Plan by failing to pay him more than $450,000 in vested benefits. In the alternative, Alba claims that ML should be equitably estopped from refusing to pay him benefits under the Plans. We conclude that the district court properly granted summary judgment in favor of ML on these alternative claims.

1.

The FACAAP is a benefit plan intended to reflect ML's "commitment to reward top producing" financial advisors and to "establish and retain a strong sales force [of financial advisors] . . . by recognizing the benefits of their contributions to" ML. J.A. 1395. The WealthBuilder Plan shares many of the same administrative provisions of the FACAAP, but is available only to a more select group of ML financial advisors. The WealthBuilder Plan "is maintained primarily for the purpose of providing deferred compensation for [the top 15% earners] who remain in the employ of [ML] until retirement or completion of a substantial period of service." J.A. 1420.

Benefits under both plans are based on a percentage of revenue that the financial advisor produces for ML. If a financial advisor meets all of the revenue production goals established by ML for a given performance period, ML calculates the "award" the financial advisor has earned and credits his account with that amount.

Awards are based solely on the revenue production of each individual financial advisor and are not contingent on ML's overall financial performance. It is undisputed that Alba met the revenue production eligibility requirements to participate in the FACAAP and WealthBuilder Plan most of his thirteen years at ML (except, for instance, during the Vogel agreement years), and that more than $456,000 was credited to Alba's Plan accounts by June 2002.

Under the FACAAP and the WealthBuilder Plan, ML pays credited awards when a participant retires. "Retirement" is defined broadly and includes "when you cease employment on or after your 55th birthday and you have completed at least 10 years of service." J.A. 1397.[7] ML concedes that Alba qualifies for "Retirement" under the Plans even though he specifically resigned rather than retired in July 2002. However, both Plans allow for the "forfeiture" of account balances if ML determines that the participant engaged in misconduct.

Alba argues that he satisfied all the objective criteria to be eligible for benefits under both Plans. Thus, he contends that the awards credited to his Plan accounts constitute earned wages that cannot be forfeited.

ML, on the other hand, argues that it paid Alba all the wages he was due each year under his normal salary/commission agreement

---

[7]The WealthBuilder Plan uses the term "Qualifying Termination" instead of "Retirement," but the two definitions are similar. J.A. 1423.

21

with ML. ML contends that the amounts credited to Alba under the FACAAP and the WealthBuilder Plan were discretionary "incentive compensation" payments that could be forfeited for several different reasons, including misconduct. Because allegations of misconduct were levied against Alba by numerous clients, ML insists that it had discretion to deem Alba's account balances forfeited.

The parties agree that whether ML breached the FACAAP and WealthBuilder Plan by not paying the Plan benefits is a question governed by New York law. "Wages" are defined under New York law as: "the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." N.Y. LAB. LAW § 190.1. Despite this broad definition, wages do not include incentive compensation benefits. Truelove v. Northeast Capital & Advisory Inc., 702 N.Y.S.2d 147, 149 (N.Y. App. Div. 2000). "The dispositive factor in determining whether compensation constitutes wages is not the labeling of the plan but whether the compensation is vested and mandatory as opposed to discretionary and forfeitable." Id. Receipt of a separate nondiscretionary salary generally negates an inference that benefits payable under another benefits plan constitute wages. See International Bus. Mach. Corp. v. Martson, 37 F. Supp. 2d 613, 618 (S.D.N.Y. 1999).

ML paid Alba a regular salary each year under a fixed compensation schedule based on sales commissions. These payments

22

were nondiscretionary and not forfeitable. Alba does not dispute that ML paid him all the sales commissions he was due under his regular salary. The benefits payable under the FACAAP and WealthBuilder Plans, however, were discretionary and forfeitable. Both of the Plans contain provisions stating that the benefits can be forfeited and that ML retains the right to determine if the benefits in the account balances should be forfeited under the terms of the Plans. Thus, even though benefits under the Plans are calculated based solely on Alba's level of production, the benefits under both Plans are discretionary and forfeitable under certain circumstances specified under the Plans. Therefore, we conclude that the amounts credited to Alba's account balances in both Plans do not constitute earned wages and, therefore, can be forfeited.

2.

Alba also argues that ML should be equitably estopped from refusing to pay the amounts credited to account balances under the FACAAP and the WealthBuilder Plan. Alba claims that ML effectively offered to pay him benefits under the Plans if he agreed to leave ML. Because he left ML, Alba contends that ML cannot "go back on its word and refuse to pay the awards." Alba Brief p. 51.

The elements essential to establish equitable estoppel are: (1) a representation was made to the plaintiff (2) upon which the plaintiff relied, and (3) the plaintiff then changed his position (4) to his detriment. Waynesboro Vill., L.L.C. v. BMC Props., 496

23

S.E.2d 64, 68 (Va. 1998).[8] Viewing the evidence in the light most favorable to Alba, ML, by its agents DiCenso and Greene, represented to Alba that he would be paid his account balances under the FACAAP and the WealthBuilder Plan if he agreed to retire. As Alba admitted in his deposition, he understood that there was a difference between retiring and resigning when he decided to resign. Thus, it is clear as a matter of law that Alba did not rely on ML's representation that he would be paid benefits if he retired.[9]

D.

Alba also argues that ML owes him approximately $15,000 under its Deferred Compensation Plan. ML failed to respond to this argument in its brief. We vacate the grant of summary judgment in

---

[8]ML argues that Alba's equitable estoppel claim fails under Virginia law. Alba does not cite Virginia or New York law in support of his equitable estoppel claim. We note, however, that the elements of equitable estoppel under New York law are similar to the Virginia elements, see Town of Hempstead v. Incorporated Vill. of Freeport, 790 N.Y.S.2d 518, 520 (N.Y. App. Div. 2005), so the same result attains under either state law.

[9]Alba contends that the distinction in ML's representation between retiring and resigning is arbitrary in light of the fact that Alba was later deemed to be retired -- even though he resigned -- under the broad definition of "Retirement" under the Plans. There is no evidence, however, that Alba was relying on the Plan definitions when he decided to resign rather than retire. Moreover, Alba alleges in his complaint that even after he resigned, DiCenso offered to give Alba his benefits if he would agree to come back to ML and retire. Alba clearly knew there was a significant difference between retiring and resigning for purposes of DiCenso's offer.

24

favor of ML on this claim and remand to the district court for further proceedings.

## E.

Alba next argues that the district court lacked jurisdiction to grant ML's motion to strike Alba's affidavit -- which was attached to his motion to alter or amend judgment -- four days after Alba filed his initial notice of appeal. Alba further argues that his affidavit was properly filed and creates genuine issues of material fact precluding summary judgment in favor of ML.

For purposes of our review, we assume without deciding that the district court lacked jurisdiction to strike Alba's affidavit. Thus, we address Alba's ultimate contention that his affidavit establishes facts requiring reversal of the district court's grant of summary judgment.

In support of its assertion that Alba was not constructively or actually discharged but instead voluntarily chose to resign, ML relies in part on the following portion of Alba's deposition testimony in which Alba references his final conversation with DiCenso the day before Alba resigned:

> Q:        [D]id you have the sense that if you did not resign from [ML], that you would have been terminated?
>
> Alba:     I can't make that conclusion.
>
> Q:        You don't know one way or the other whether or not you'd have been terminated?

25

Alba:       No, because Mr. DiCenso in that 60-second phone call after the second phone call, said that, "maybe we can work -" words to the effect that "Maybe we can – We'll talk about this next week,  we can maybe make an arrangement, or something."  Okay, but, um, no.

Q:          So it was possible [ML] had contemplated working out some sort of arrangement with you, short of terminating you.

Alba:       Yes.

J.A. 196.[10]

Despite this testimony, Alba states in his new affidavit that in the weeks leading up to his resignation ML "made it absolutely clear to me that there was <u>no possibility</u> that I could continue to

---

[10]Alba was deposed by ML on three days.  The last day of deposition was approximately two months after the first two days.  On his last day of deposition, Alba testified that he could not remember DiCenso saying that they would get together the next week and "work something out."  J.A. 1636.  After ML's counsel showed Alba the transcript of his contrary testimony from his earlier deposition, Alba agreed that DiCenso did say in their last phone conversation that they should get together the next week and "work it out."  J.A. 1638.  However, Alba added that he felt that DiCenso had no intention of working things out.

Alba's subsequent deposition testimony casting doubt on the sincerity of DiCenso's intentions does not create a genuine issue of material fact on Alba's constructive or actual discharge claims.  Regardless of whether Alba believed that DiCenso would help Alba "work things out," Alba testified that he believed at the time he resigned that it was possible that ML would not terminate him.  Alba further testified that (apart from his resignation) there was nothing preventing him from going back to work the following Monday and performing his duties as a financial advisor at ML.

work at" ML.  J.A. 1935 (emphasis added).  Alba further insists in his affidavit that any implication derived from his prior deposition testimony that he believed that he might be able to continue his employment at ML "is the opposite of what I meant." Id.

Alba's subsequent affidavit statements contradict his deposition testimony.  Alba's deposition testimony clearly establishes that Alba believed at the time he resigned that it was possible that he would be allowed to continue his employment at ML. It is well recognized that a plaintiff may not avoid summary judgment by submitting an affidavit that conflicts with earlier deposition testimony.  See Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984).  "A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Id.  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  Id. (quoting Perma Research and Development Co. v. The Singer Co., 410 F.2d 572, 578 (2nd Cir. 1969)). Alba's affidavit statements attempting to explain and refute his earlier deposition testimony do not create a genuine issue of material fact

27

regarding whether he was constructively or actually discharged by ML.[11]

IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of ML as to all claims except for Alba's deferred compensation claim. We vacate that portion of the judgment and remand for further proceedings.

<u>AFFIRMED IN PART AND</u>
<u>VACATED AND REMANDED IN PART</u>

---

[11]Alba's 25-page affidavit contains assertions of fact that are largely cumulative to evidence already in the record. We have reviewed the entire affidavit, but none of the statements creates any genuine issue of material fact precluding summary judgment on the issues before us.